Heidi McIntosh (Utah State Bar No. 6277)
Michael Hiatt (*pro hac vice pending*)
Alex Hardee (*pro hac vice pending*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
303-623-9466
hmcintosh@earthjustice.org
mhiatt@earthjustice.org
ahardee@earthjustice.org

*Attorneys for Living Rivers, Grand Canyon Trust, Center for Biological Diversity, Natural Resources Defense Council, Sierra Club, Waterkeeper Alliance, Inc., Colorado Riverkeeper, and Utah Physicians for a Healthy Environment*

Michael Toll (*pro hac vice pending*)
Grand Canyon Trust
4404 Alcott St.
Denver, CO 80211
303-309-2165
mtoll@grandcanyontrust.org

*Attorney for Grand Canyon Trust*

Edward B. Zukoski (*pro hac vice pending*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
303-641-3149
tzukoski@biologicaldiversity.org

*Attorney for Center for Biological Diversity*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

LIVING RIVERS; GRAND CANYON
TRUST; CENTER FOR BIOLOGICAL
DIVERSITY; NATURAL RESOURCES
DEFENSE COUNCIL; SIERRA CLUB;
WATERKEEPER ALLIANCE, INC.;
COLORADO RIVERKEEPER; and

| | |
|---|---|
| UTAH PHYSICIANS FOR A HEALTHY ENVIRONMENT;<br><br> Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, Secretary of the Interior; JOSEPH BALASH, Assistant Secretary for Land and Minerals Management; U.S. DEPARTMENT OF THE INTERIOR; U.S. BUREAU OF LAND MANAGEMENT; U.S. FISH & WILDLIFE SERVICE; and LARRY CRIST, Field Supervisor of the U.S. Fish & Wildlife Service's Utah Field Office;<br><br> Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Case No. _____ |

## **INTRODUCTION**

1.      This case challenges the federal government's failure to comply with bedrock environmental laws when it granted rights-of-way across public lands to Estonian-owned company Enefit American Oil LLC.  These rights-of-way will enable Enefit to construct and operate the nation's first commercial-scale oil-shale mine and processing plant.

2.      Enefit plans to build its facility in the Uinta Basin, a remote, high-desert plateau in northeastern Utah characterized by beautiful scenery, remarkable geological features, and steep-walled canyons.  The Green River, one of the Basin's defining features, winds through the canyons of Dinosaur National Monument along the eastern flank of the Uintah Mountains and eventually plunges through the Book Cliffs at Desolation Canyon.  There, the Green River meets the White River, a major tributary that drains Colorado's Flat Tops Wilderness.  Towering 800-foot cliffs line the White River—a favorite canoeing and rafting destination—along with broad

2

sloping terraces, buttes, pinnacles, and eroded towers.  Some thirty miles upstream from its confluence with the Green River and just west of the Utah-Colorado state line, the White River meets Evacuation Creek, one of the Basin's few perennial waterways.  It is roughly at this spot that Enefit would transform nearly fifteen square miles into an industrial complex for mining and processing oil shale.  Enefit's oil shale operations would drain more than 100 billion gallons of water from the Green River and produce 50,000 barrels of oil every day for three decades or more.

3.     Dubbed the South Project, this complex would include a massive processing plant to turn oil shale rock into refinery-ready synthetic crude oil.  To enable Enefit's South Project, the Bureau of Land Management (BLM) approved the company's applications for five utility rights-of-way across federal public land to connect the project area with an upgraded access road, electric-transmission lines, and pipelines for water, natural gas, and oil product.

4.     As alleged below, BLM and the U.S. Fish & Wildlife Service (Service) failed to adequately analyze the significant adverse environmental impacts of Enefit's oil shale development.  Instead, BLM and the Service only focused on the relatively minimal impacts caused by constructing and maintaining the pipelines, transmission lines, and access road.  This impermissibly narrow review violated the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA), undermined informed decision making and public participation, and failed to prevent harm to imperiled fish and plant species.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).  Plaintiffs are challenging final agency actions by BLM and the Service, and are

3

pursuing their claims under NEPA, 42 U.S.C. §§ 4321–4370h; the ESA, 16 U.S.C. §§ 1531–44; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06. This Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) (United States as defendant) and 16 U.S.C. § 1540(g)(1) (ESA citizen suit).

6. Pursuant to 16 U.S.C. § 1540(g)(2), on February 26, 2019, Plaintiffs provided Defendants with written notice of intent to sue regarding the ESA violations alleged herein. More than sixty days have passed since Defendants were put on notice of these violations. Defendants have not remedied the violations.

7. This Court has authority to grant declaratory and injunctive relief pursuant to the ESA, 16 U.S.C. § 1540(g); the APA, 5 U.S.C. § 706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; and its inherent authority to issue equitable relief. An actual, justiciable controversy exists under 28 U.S.C. § 2201.

8. The Court has authority to award costs and attorneys' fees under 16 U.S.C. § 1540(g)(4) (ESA) and 28 U.S.C. § 2412 (Equal Access to Justice Act).

9. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e) because the BLM and the Service have offices in this district and a substantial part of the events and omissions giving rise to the claims in this action occurred in this district. Additionally, Plaintiffs Living Rivers, Colorado Riverkeeper, and Utah Physicians for a Healthy Environment maintain their principal places of business in Utah. Venue is also proper under 16 U.S.C. § 1540(g)(3)(A) (ESA) because the violations occurred in this district.

## PARTIES

10.     Plaintiff Living Rivers is a nonprofit organization based in Moab, Utah, that promotes river restoration through public education and mobilization.  By articulating conservation and alternative management strategies to the public, Living Rivers seeks to revive the natural habitat and spirit of rivers by undoing the extensive damage done by dams and water-intensive energy development on the Colorado Plateau.  Living Rivers has approximately 1,200 members in Utah, Colorado, and other states.  Living Rivers members and staff use and recreate on the Green River.

11.     Plaintiff Grand Canyon Trust is a nonprofit corporation with over 3,500 members. The Trust is headquartered in Flagstaff, Arizona and has offices in Utah and Colorado.  The Trust's mission is to safeguard the wonders of the Grand Canyon and the Colorado Plateau, while supporting the rights of Native peoples.  The Trust's advocacy is motivated by a vision for the Colorado Plateau in which wildness, a diversity of plants and animals, clean air, and flowing rivers abound, and where a livable climate endures.

12.     Plaintiff Center for Biological Diversity is a national nonprofit organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has over 61,000 members, is headquartered in Tucson, Arizona, and employs staff in Utah.  The Center has a long history of environmental advocacy within the southwestern United States generally, and in relation to public lands conservation in particular. As specifically relevant to this matter, the Center has worked to protect species and habitats that occur within the project area, including the Colorado pikeminnow, razorback sucker, bonytail

chub, humpback chub, Graham's beardtongues, White River beardtongues, greater sage-grouse, and yellow-billed cuckoo.

13.     Plaintiff Natural Resources Defense Council (NRDC) is a nonprofit environmental membership organization that uses law, science, and the support of more than two million members and activists throughout the United States to protect wildlife and wild places and to ensure a safe and healthy environment for all living things.  Over 2,600 of NRDC's members reside in Utah.  NRDC has a long-established history of working to protect public lands and clean air in Utah and addressing climate change by promoting clean energy and reducing America's reliance on fossil fuels.

14.     Plaintiff Sierra Club is a national nonprofit organization with 64 chapters and over 700,000 members nationwide, including more than 5,400 in Utah.  Its members are dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  Sierra Club's concerns encompass the exploration, enjoyment, and protection of the lands, water, and air in Utah.

15.     Plaintiff Waterkeeper Alliance, Inc. is a global nonprofit environmental organization dedicated to protecting and restoring water quality to ensure that the world's waters are drinkable, fishable and swimmable.  Waterkeeper Alliance is comprised of more than 300 Waterkeeper Member Organizations and Affiliates working in 44 countries on 6 continents, protecting over 2.5 million square miles of watersheds.  In the United States, Waterkeeper Alliance represents the interests of approximately 175 U.S. Waterkeeper Member Organizations

and Affiliates, which include Living Rivers and Colorado Riverkeeper and other organizations in Utah, to preserve and protect their waterways from water-intensive and polluting energy development and other threats.  Waterkeeper also represents the collective interests of thousands of individual supporting members that live, work, and recreate in and near waterways across the country, including in Utah.

16.     Plaintiff Colorado Riverkeeper is a licensed member of the Waterkeeper Alliance and has three licensed affiliate programs with the Waterkeeper Alliance: Green River Action Network; Upper Green River Network; and Las Vegas Water Defender.  Colorado Riverkeeper staff and affiliates are interested in maintaining the health of the Green River and Colorado River, including in areas that would be affected by Enefit's utility rights-of-way and oil shale development.

17.     Plaintiff Utah Physicians for a Healthy Environment (UPHE) is one of the largest civic organizations of health care professionals in Utah.  UPHE is a nonprofit organization with over 3,000 members and supporters, including more than 350 physicians and working professionals.  UPHE is concerned about the health risks present in our environment, based on the overwhelming, convincing evidence in the medical literature demonstrating that a wide array of chronic diseases are more common among people who are exposed to higher levels of air pollution, particulates especially.  UPHE is dedicated to protecting the health and wellbeing of the citizens of Utah by promoting science-based education and interventions that result in progressive, measurable improvements to the environment.

18.     The Plaintiffs' members and staff are concerned with protecting the wildlife, plants, scenery, air quality, water quality, and other natural values of Utah.  Members and staff of

the Plaintiffs' organizations regularly use and enjoy public lands near and including the utility

rights-of-way, and adjacent to Enefit's proposed oil shale development, for recreational,

scientific, and aesthetic purposes, and intend to continue doing so.  For instance, the Plaintiffs'

members regularly engage in hiking, camping, stargazing, wildlife observation, photography,

scenic driving, and visiting panoramic vistas near and adjacent to the utility rights-of-way and

proposed oil shale development, and they intend to continue doing so.

19.     For these reasons, the Plaintiffs' members and staff seek to protect the wildlife,

scenery, air quality, and other natural values of the region from the direct, indirect, and

cumulative impacts of the utility corridor, so that they can continue using and enjoying the area

without hindrance.  For example, they wish to continue to use and enjoy areas near the utility

rights-of-way without the risk of a spill from the natural gas or product oil pipelines into the

White River or Evacuation Creek, and without visual impairment caused by 30 miles of power

lines.  Moreover, the Plaintiffs' members wish to continue enjoying the affected area without

suffering from the environmental impacts that would result from the Enefit oil shale operation,

which is the purpose of the utility rights-of-way.

20.     The Defendants' decision to approve the utility rights-of-way for Enefit's oil

shale development irreparably harms Plaintiffs' interests and the interests of their members

because the development will destroy wildlife habitat and vegetation, deplete the Upper

Colorado River Basin, degrade surface and groundwater quality, dramatically increase air

emissions, and diminish Plaintiffs' members' enjoyment of surrounding areas.  BLM's failure to

comply with NEPA harms the Plaintiffs' members and staff by denying them the right to

informed decision making and public disclosure, as well as the right to meaningfully participate

in the decision-making process.  BLM and the Service's failure to comply with the ESA and the resulting harm to endangered and special-status species harms the Plaintiffs' members and staff's scientific and aesthetic interest in those species.  The relief sought, including declaratory and injunctive relief, will redress Plaintiffs' injuries.

21.     Defendant David Bernhardt is the Secretary of the Interior.  Mr. Bernhardt is sued in his official capacity.

22.     Defendant U.S. Department of the Interior is a federal agency responsible for managing about five hundred million acres of federal public lands across the United States.  The Department of the Interior, through its sub-agency BLM, decides whether to grant rights-of-way across land administered by BLM.

23.     Joseph Balash is Assistant Secretary for Land and Minerals Management within the U.S. Department of the Interior.  Mr. Balash is sued in his official capacity.

24.     Defendant U.S. Bureau of Land Management is a federal agency within the Department of the Interior and is responsible for the management of approximately twenty-three million acres of federal public land in Utah.  BLM decides whether to grant rights-of-way that cross land it administers.

25.     Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior, which has the primary responsibility for implementing the ESA for freshwater fish species and terrestrial plants.

26.     Larry Crist is Field Supervisor of the U.S. Fish & Wildlife Service's Utah Field Office.  Mr. Crist is sued in his official capacity.

**LEGAL BACKGROUND**

I.      **National Environmental Policy Act**

27.     NEPA is our "basic national charter for protection of the environment."  40

C.F.R. § 1500.1(a).  It serves twin goals.  First, it aims to ensure that federal agencies carefully

consider detailed information regarding the environmental impact of a proposed action before

reaching a decision on the action.  Second, it ensures that information about the impacts is made

available to members of the public so that they may play a role in the decision-making process.

28.     NEPA and its implementing regulations require federal agencies to prepare an

environmental impact statement (EIS) for all "major Federal actions significantly affecting the

quality of the human environment."  42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4.

29.     The agency must, among other things, rigorously explore and objectively evaluate

all reasonable alternatives to the actions considered in the EIS, including a baseline alternative of

taking "no action."  40 C.F.R. § 1502.14.  The environmental effect of taking no action,

including the predictable private actions by others, must be analyzed and compared with the

effects of approving the proposed action.  46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

30.     NEPA also requires the agency to take a "hard look" at all direct, indirect, and

cumulative environmental effects of the proposed action and its alternatives.  40 C.F.R. §§

1502.14, 1502.16; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Direct effects are those that are "caused by the action and occur at the same time and place."  40

C.F.R. § 1508.8(a).  Indirect effects are those that are "caused by the action and are later in time

or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8(b).  A

cumulative effect is "the impact on the environment which results from the incremental impact

of the action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.*

§ 1508.7.  "Effects" are synonymous with "impacts."  *Id.* § 1508.8.

31.     The agency proposing an action must also analyze connected actions, cumulative

actions, and similar actions, together with the proposed action, in a single EIS.  Actions are

connected if each action would not take place without the other and thus has no independent

utility.  *See id.* § 1508.25(a)(1).  Cumulative actions are those that "when viewed with other

proposed actions have cumulatively significant impacts and should therefore be discussed in the

same impact statement."  *Id.* § 1508.25(a)(2).  Similar actions are those that, "when viewed with

other reasonably foreseeable or proposed agency actions, have similarities that provide a basis

for evaluating their environmental consequences together, such as common timing or

geography."  *Id.* § 1508.25(a)(3).

32.     "Incomplete or unavailable information" may excuse an agency's obligation to

take a hard look at the proposed action's environmental impacts only if the incomplete

information is not "essential to a reasoned choice among alternatives," or if the costs of obtaining

the information are "exorbitant."  *Id.* § 1502.22(a).  If the costs of obtaining the information are

exorbitant or the means to obtain it are not known, the agency must include in the EIS:

> (1) A statement that such information is incomplete or unavailable;
> (2) a statement of the relevance of the incomplete or unavailable
> information to evaluating reasonably foreseeable significant
> adverse impacts on the human environment;
> (3) a summary of existing credible scientific evidence which is
> relevant to evaluating the reasonably foreseeable significant
> adverse impacts on the human environment, and
> (4) the agency's evaluation of such impacts based upon theoretical
> approaches or research methods generally accepted in the scientific
> community.

*Id.* § 1502.22(b)

## II.     Endangered Species Act

### A.     Species Listed as Threatened or Endangered

33.     Section 7(a)(2) of the ESA prohibits federal agencies from undertaking actions that are "likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of critical habitat.  16 U.S.C. § 1536(a)(2).

34.     To ensure compliance with section 7(a)(2)'s substantive mandate, the ESA and its implementing regulations require federal "action agencies" (here, BLM) to consult with the Service before undertaking any "action" that "may affect" a listed species or its designated critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  An "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," in which there is "discretionary Federal involvement or control."  50 C.F.R. §§ 402.02, 402.03.  The "may affect" threshold for section 7(a)(2) consultation is triggered by "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character."  51 Fed. Reg. 19,926, 19,949 (June 3, 1986).  The Service and BLM must use the best scientific and commercial data available throughout the consultation process.  16 U.S.C. § 1536(a)(2).

35.     For actions that are "major construction activities," BLM must first prepare a biological assessment, which "shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat" within the "action area."  50 C.F.R. § 402.12.  The biological assessment must determine whether the action "may affect" any such species or habitat, and if so, whether the species or habitat are "likely to be adversely affected by the action."  *Id.* §§ 402.14, 402.12(a).

36.     The ESA defines "effects of the action" as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." *Id.* § 402.02.  "Indirect effects" are those that are "caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.*  "Interrelated actions" are those that are "part of a larger action and depend on the larger action for their justification." *Id.*  "Interdependent actions" are those that "have no independent utility apart from the action under consideration." *Id.*  Finally, "action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

37.     If the biological assessment concludes that the proposed action is "likely to adversely affect" a listed species or its critical habitat, the action agency must initiate formal consultation with the Service.  *Id.* § 402.14(a), (b)(1).  During the consultation process, the action agency may not make any irreversible or irretrievable commitments of resources.  16 U.S.C. § 1536(d).

38.     The Service completes formal consultation when it issues a biological opinion (BiOp) determining whether the proposed action, taken together with its cumulative effects, is "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).  A BiOp can reach any of three findings: (1) no jeopardy or adverse modification; (2) that the action will cause jeopardy or adverse modification that can be avoided by implementing specified reasonable and prudent alternatives to the proposed action; or (3) that jeopardy or adverse modification is unavoidable and thus the action cannot proceed.  *Id.* § 402.14(h)(3).  The BiOp must include a "detailed

discussion" and independent analysis of the "effects of the action"—including the action's

"indirect effects" and effects of "interrelated or interdependent activities—and the "cumulative

effects" on listed species or critical habitat with the "action area." *Id.* §§ 402.02, 402.14(h)(2),

402.14(g); *see also* Service, Endangered Species Consultation Handbook, 4-15 (Mar. 1998),

*available at* www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf (noting that

the Service can disagree with BLM's analysis).

39.     The ESA allows citizen suits to enjoin government agencies alleged to be in

violation of the ESA. 16 U.S.C. § 1540(g)(1)(A).

**B.     Upper Colorado River Basin-Specific Consultation Requirements**

40.     The Upper Colorado River Basin is home to four endangered fish species—the

Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub.  In 1987, the

Service determined, based on more than 100 biological opinions issued over the course of a

decade, that all four fish species are in jeopardy of extinction owing to depletions of water from

their habitat, among other threats.  Recognizing that any new depletion to the Upper Colorado

River Basin would result in the Service issuing a "jeopardy" biological opinion, numerous

stakeholders created the Upper Colorado River Basin Recovery Implementation Program (RIP).

The purpose of the RIP is to permit new water developments to proceed while at the same time

trying to recover the four fish species and avoid a "jeopardy" determination.  The Upper

Colorado River RIP's long-term recovery plan, called the Recovery Action Plan (RIPRAP),

identifies specific actions to recover the endangered fish species.

41.     Under the RIPRAP, a proposed depletion's size determines the level of

consultation and the mitigation measures—including payment of a depletion fee—that the

Service deems sufficient to avoid jeopardizing the four fish species.  RIPRAP's project-specific,

prescribed mitigation measures are intended to provide reasonable and prudent alternatives for

Upper Colorado River Basin-depleting proposed actions undergoing section 7 consultation.  Use

of the RIPRAP as the reasonable and prudent alternative, or incorporation of specific RIPRAP

measures into the proposed action itself, is meant to prevent water depletions from jeopardizing

the fish species or destroying or adversely modifying their critical habitat.

42.     According to the Service, a proposed action will presumptively jeopardize the

four fish species or adversely modify their critical habitat if the action will cause depletions to

the Upper Colorado River Basin of more than 0.1 acre-feet per year (afy) and the action did not

undergo formal consultation with the Service to determine RIPRAP's applicable mitigation

measures.

**C.      Species Proposed for Listing**

43.     Distinct from the consultation requirement of section 7(a)(2), which applies to

species listed as threatened or endangered, the ESA contains protections for "proposed species."

Proposed species are those that the Service has proposed in the Federal Register to list as

threatened or endangered under ESA section 4.  50 C.F.R. § 402.02.  Section 7(a)(4) mandates

that BLM shall "confer" with the Service on any action "likely to jeopardize the continued

existence" of any proposed species or "likely to result in the destruction or adverse modification

of critical habitat proposed to be designated for such species."  16 U.S.C. § 1536(a)(4); 50 C.F.R.

§ 402.10.

44.     BLM is to use its biological assessment to determine whether a conference is

necessary.  50 C.F.R. § 402.12(a).  The ESA requires that the biological assessment "shall

evaluate," in addition to listed species, the potential "effects of the action"—including the action's "indirect effects" and effects of "interrelated or interdependent" activities—on proposed species or proposed critical habitat that may be present within the "action area."  16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.02, 402.12(a).

45.     If the biological assessment concludes that the proposed action is likely to jeopardize the continued existence of a proposed species or to destroy or adversely modify its proposed critical habitat, BLM must "confer" with the Service.  16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10(a).  If a conference is required, the Service will make advisory recommendations, if any, on ways to minimize or avoid adverse effects of the action that would impact the proposed species or critical habitat.  50 C.F.R § 402.10(c).  If the biological assessment indicates that the proposed action is "not likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat," a conference is not required only if the Service concurs with BLM's conclusion.  *Id.* § 402.12(k)(1).

### III.     Administrative Procedure Act

46.     Claims under NEPA, and certain claims under the ESA, are brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06.

47.     The APA allows persons and organizations to challenge final agency actions in federal courts.  *Id.* §§ 702, 704.  The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id.* § 706(2)(A).

## FACTS

### I.     Background on Oil Shale Development

48.     Oil shale is a sedimentary rock with a high concentration of a hydrocarbon called kerogen.  Through a process called retorting, oil shale is heated to extreme temperatures to release a petroleum-like synthetic crude oil.  A second process, called upgrading, heats the synthetic oil in the presence of hydrogen and a chemical catalyst to reduce its sulfur and nitrogen content and produce a refinery-ready petroleum feedstock.

49.     The United States has the largest quantity of oil shale in the world, concentrated primarily in the Green River Formation underlying Utah, Colorado, and Wyoming.  For more than a century, oil shale has been touted as a potential source of unconventional fuel, and there have been several halting attempts at commercial production.  Technical challenges, large expenditures of energy relative to energy output, and the consumption of tremendous amounts of water, among other issues, have limited oil shale's economic viability as a fuel source.

50.     Despite several periods of public subsidization, there has never been a successful commercial-scale oil shale operation in the United States.  For instance, even after more than a billion dollars in loan guarantees in the early 1980s to support the Exxon Corporation's planned 47,000 barrel-per-day oil-shale facility in the Green River Formation, astronomical costs forced Exxon to abandon its partially constructed facility and lay off thousands of workers.

51.     Technical and economic challenges resulted in oil shale falling out of vogue for more than two decades.  The Energy Policy Act of 2005 authorized BLM to lease federal oil shale tracts to facilitate the development of commercially viable oil shale projects.

52.     Federal leasing of oil shale resources is now managed through a research, development, and demonstration (RD&D) lease program.  In order to address the uncertainties regarding the economic and technical feasibility of oil shale processing technologies, BLM initiated the RD&D program to ensure that the agency issues large-tract oil shale leases only to applicants who have demonstrated that they are capable of producing commercial quantities of synthetic crude oil before obtaining a large-acreage federal lease.  Applicants nominate an RD&D tract—previously 160 acres, now 640 acres —and a contiguous area of 4,960 acres to be reserved for commercial leasing.  If an RD&D lessee demonstrates that it can produce commercial quantities of oil from the 160-acre (or 640-acre) parcel, BLM may grant the applicant a commercial lease of the contiguous preference rights—a so-called "Preferential Lease."

**II.      The South Project and the Utility Rights-of-Way**

53.     In 2007, after soliciting applications for an RD&D lease on the 160-acre site of a failed oil shale mine in the Uinta Basin, BLM selected the Oil Shale Exploration Company (OSEC) as the RD&D lessee and granted the company an additional Preferential Lease option on 4,960 adjoining acres if its technology proved successful.

54.     In 2011, Enefit purchased OSEC, acquiring its RD&D lease, Preferential Lease option, and OSEC's 13,000-acre tract of private land adjacent to the Preferential Lease, located just south of the White River, upstream of its confluence with the Green River.  This private tract is the intended location of Enefit's South Project oil shale operation.

55.     In 2012, Enefit developed and began operating a new retort processing technology, called Enefit280 in Estonia.  In 2013, Enefit began constructing two additional

Enefit280 units and an upgrading facility at its Estonian plant.  Enefit seeks to use this technology at the South Project.  The company plans to construct a 320-acre oil shale processing plant, including multiple Enefit280 retorting units, an upgrading facility with an appurtenant hydrogen production facility, a power block, and a wastewater treatment unit at the site.  Then, Enefit plans to mine about 9,000 acres of oil shale from its South Project property and run it through the on-site processing plant before piping the resulting synthetic crude to petroleum refineries in Salt Lake City and beyond.

56.     To enable its oil shale mining and processing plans, Enefit applied to BLM for five rights-of-way over federal public lands to supply utilities to, and deliver processed oil from, the South Project.  These rights-of-way, otherwise known as the Utility Project, would permit Enefit to:

- Build 19 miles of water pipeline (BLM # UTU-89451);
- Build 9 miles of natural gas pipeline (BLM # UTU-89452);
- Build 11 miles of oil product delivery pipeline (BLM # UTU-89449);
- Build 30 miles of 138-kV transmission lines (BLM # UTU-89453) (in conjunction with Moon Lake Electric Association); and
- Upgrade and realign Dragon Road, which accesses the South Project property (BLM # UTU-19398).

57.     The sole purpose of these rights-of-way—their raison d'être—is to enable Enefit to build and operate the South Project.

## III.   The South Project's Environmental Impacts

58.     Enefit's South Project complex would mine more than 28 million tons of oil shale per year, for thirty years or more, and would generate hundreds of millions of tons of waste rock and overburden.  The South Project's resulting leachate and sedimentation could degrade

groundwater and surface water quality, and could harm the four endangered fish species of the Upper Colorado River Basin.

59.     Mining and processing oil shale at the South Project would require large amounts of water.  The rights-of-way granted by BLM would allow Enefit to construct a water pipeline that would drain up to 10,867 afy of water from the Green River—more than 100 billion gallons over three decades.  This large diversion would potentially jeopardize the continued existence of the four fish species and adversely modify their habitat.

60.     The rights-of-way also allow Enefit to build a natural gas pipeline and oil pipeline, which would cross the White River and several of its tributaries.  A petroleum spill from these pipelines would degrade surface water quality and could harm the endangered fish species.

61.     The South Project would nearly double the Uinta Basin's oil output, producing 50,000 barrels every day and significantly degrading the Basin's air quality.  The 547 million barrels of oil produced over three decades would have lifecycle carbon dioxide emissions up to 75 percent higher than those from conventional fuels.

62.     In addition, the rights-of-way and Enefit's oil shale operations would destroy a significant portion of the remaining critical habitat for two plant species proposed for listing under the ESA, the Graham's penstemon and White River penstemon.

## IV.    BLM's NEPA Process for the Rights-of-Way

### A.    Utility Project Draft EIS

63.     In 2013, after receiving Enefit's applications for the five utility rights-of-way, BLM published a Notice of Intent to prepare a draft EIS.  The Grand Canyon Trust, Living

Rivers, Sierra Club, and other groups submitted comments to BLM on the scope of issues that

BLM should consider in the EIS.  BLM issued its draft EIS in April 2016.

64.     BLM's draft EIS identified the purpose and need of the proposed rights-of-way as

providing access and utilities to Enefit's South Project.  But it contained only a cursory,

qualitative analysis of the South Project's environmental impacts.

65.     For its no-action alternative, BLM assumed that Enefit would fully build out the

South Project regardless of BLM's decision on the rights-of-way because Enefit supposedly

would secure natural gas, electricity, water, and product delivery through substitute means.

66.     In June 2016, Plaintiffs submitted detailed comments expressing concerns

regarding the scope and depth of the draft EIS's analysis.  Plaintiffs stated that Enefit's supposed

substitute means for securing utilities for the South Project absent the rights-of-way are

technically and economically infeasible.  Plaintiffs also stated, among other things, that the draft

EIS failed to take the "hard look" required by NEPA at the South Project's impacts on climate

change, air quality, solid and hazardous waste, surface and groundwater quality, and protected

wildlife and plant species.

67.     The U.S. Environmental Protection Agency (EPA), a cooperating agency in the

preparation of the Utility Project EIS, also submitted comments to BLM on the draft EIS.

Noting that the only purpose for the rights-of-way is to enable Enefit's South Project oil-shale

mine and processing plant, EPA asserted that BLM failed to take a hard look at the South

Project's substantial environmental impacts as indirect effects caused by the Utility Project.

Specifically, EPA found that the draft EIS's nonexistent quantitative analysis, and only very

general qualitative discussion, of the South Project's substantial impacts on climate change, air

quality, and water quality would not allow the public or BLM to understand or evaluate the environmental impacts of approving the Utility Project.

68.    Additionally, EPA stated that, given the draft EIS's almost-complete lack of analysis of Enefit's purported substitute means to supply the South Project with utilities, BLM lacked any reasoned basis to conclude the South Project would proceed to full buildout without the rights-of-way.

69.    A few years later in 2018, EPA designated portions of the Uinta Basin, encompassing the Utility Project and much of the South Project, as "nonattainment," or out of compliance, with the Clean Air Act's national ambient air quality standard (NAAQS) for ozone. Ground-level ozone is a dangerous pollutant that causes significant health impacts.  It forms when sunlight reacts with volatile organic compounds and nitrogen oxides.  Due to oil and gas development combined with winter atmospheric conditions, the Uinta Basin has on some winter days suffered ozone pollution worse than that in most major U.S. metropolitan areas and far higher than is healthy to breathe.

70.    In January 2018, in anticipation of EPA's nonattainment designation, Plaintiffs submitted supplemental comments to BLM stressing that the agency's final EIS for the rights-of-way must analyze the Utility Project and South Project's impacts in light of the nonattainment designation.

### B.    Utility Project Final EIS

71.    BLM issued its final EIS (FEIS) for the Utility Project in May 2018.

72.    The FEIS contained only a cursory, qualitative discussion of the impacts to surface water resources and the four endangered Upper Colorado River fish species from a

22

natural gas and oil product pipeline spill.  It contained a similarly limited analysis of the impacts

from the water pipeline's withdrawal of up to 10,867 afy from the Green River.

73.     As to the South Project, between the draft and final EIS, BLM made an about-face

on its characterization of Enefit's oil shale facility.  The agency disavowed its prior conclusion

that the South Project was an "indirect effect" of the Utility Project, and accordingly moved the

text discussing the South Project from the FEIS's indirect-effects section to its cumulative-

effects section.  BLM explained this change in its position by asserting that it assumed the South

Project would proceed to full buildout regardless of its decision on the rights-of-way by securing

natural gas, electricity, and water utilities and product delivery through substitute means.  BLM

also took the position that the South Project and Utility Project were not "connected actions" and

declined to analyze Enefit's environmental impacts.

74.     The FEIS included only a perfunctory, qualitative discussion of the South

Project's impacts on soil resources, surface and groundwater quality and quantity, the

endangered Colorado River fish species, the penstemon plant species, climate change, air quality

and other resources.  The FEIS failed to mention the EPA's ozone-nonattainment designation for

parts of the Uinta Basin encompassing the South Project.

75.     Moreover, the FEIS lacked all but the most general, qualitative impacts analysis

of the no-action alternative—denying the rights-of-way—which like its indirect effects analysis,

assumed the South Project would proceed to full buildout even without the rights-of-way.

### i.     BLM's Assumption of Full South Project Buildout

76.     BLM's NEPA analysis assumed that Enefit would build the South Project even

without the rights-of-way.   BLM incorporated this assumption into the no-action alternative, and

this assumption also served as BLM's reason for asserting that the South Project's environmental impacts are not indirect effects of the rights-of-way.  BLM reached this conclusion based exclusively on Enefit's unsupported assertions that alternatives exist to supply the South Project's utilities.  These alternatives, however, will dramatically increase Enefit's costs and are technically dubious.

a.   <u>Substitute Water Supplies</u>

77.    The water pipeline that BLM approved as part of the Utility Project would enable Enefit to supply the South Project using a water right (no. 49-258) that allows nearly 11,000 afy to be diverted from the Green River.  BLM claimed in the FEIS that if the agency did not allow Enefit to build that pipeline, Enefit could supply the South Project with a different water right, no. 49-1639.  But that water right allows Enefit to divert, at most, 48 afy—less than one-half of one percent of the water Enefit would deliver to the South Project through the Utility Project.

78.    BLM also claimed that Enefit could try to change the surface points of diversion for the large Green River water right to groundwater points of diversion on the South Project property.  But Deseret Generation and Transmission Cooperative (DG&T)—not Enefit—owns that water right.  To accomplish such a change in points of diversion, DG&T would have to satisfy the significant burden of proving to the Utah Division of Water Resources that diverting the surface water right through groundwater wells would not injure other vested water rights.  And even if groundwater pumping could satisfy the South Project's water demand, Enefit could not use that groundwater in its processing plant without investing in expensive reverse osmosis treatment units to remove high levels of dissolved solids.  Even then, Enefit and BLM have admitted that the groundwater wells could fail to produce sufficient quantity to satisfy the South

Project's demand.

79.    BLM also claimed that Enefit could purchase and truck the water it needs to the South Project.  But to do that, Enefit would need to run one large capacity tanker truck to the South Project about every 80 seconds, twenty-four hours a day, for thirty years or more.  Enefit has acknowledged that purchasing and trucking water to the South Project—even just to supply the balance of the South Project's water needs after obtaining some water from its other water right or groundwater pumping—would almost certainly be both technically and economically infeasible.

80.    Finally, BLM claimed that, absent the rights-of-way, Enefit could use its large Green River water right to divert nearly 11,000 afy from the White River.  But Enefit has acknowledged that the White River's extremely low flows during drought years would force it to purchase and truck water to the South Project, which it conceded is technically and economically infeasible.

b.    <u>Substitute Natural Gas</u>

81.    Without the rights-of-way, BLM claimed in the FEIS that Enefit could supply natural gas to the South Project using the existing Summit MidStream or Mapco natural gas pipelines.  Utilizing that pipeline's unprocessed natural gas, however, would require Enefit to install a costly gas cleaning unit at the South Project plant.

82.    Although BLM also claimed that trucks could provide daily or weekly natural gas deliveries, natural gas trucking would present similar economic and technical obstacles as trucking water to the South Project.

c.    <u>Substitute Product Oil Transport</u>

83.     Without the Utility Project's oil-product pipeline, BLM claimed Enefit would truck its product to refineries.  To truck the South Project's anticipated 50,000 barrels per day of oil product, Enefit would have to construct a new truck-loading terminal and would have to run more than 210 large-capacity tanker trucks to the South Project site every day.  This would require one tanker truck, roundtrip, about every 6 minutes, 24 hours per day, every day, for 30 years or more.

84.     Enefit estimated that trucking its oil product offsite would be nearly 1,400 percent more expensive than pipeline transport.  Trucking the oil product would also further stress the already heavily stressed roads of the Uinta Basin.  Given these facts, Enefit has admitted that trucking oil product would be neither practical nor economically feasible at target production levels.

d.     Substitute Electricity

85.     Absent the Utility Project's transmission lines, BLM claimed Enefit could use an existing 69-kV transmission line to supply electricity to the South Project.  Enefit anticipates needing 125 to 200 MW of electric capacity.  But the 69-kV line may not have more than 5 to 6 MW of available capacity—less than 5 percent of Enefit's total electric demand.  According to BLM, Enefit primarily would rely on natural gas (necessitating even more trucking or cleaning of Summit's unprocessed natural gas) or trucked-in diesel to supply a new bank of natural gas- or diesel-fired generators.

C.     BLM's Record of Decision

86.     In comments on the FEIS submitted in July and August 2018, Plaintiffs urged BLM to rectify the FEIS's numerous errors and inadequacies.

26

87.     These comments observed that BLM's central assumption that the South Project would proceed to full buildout under the no-action alternative was irrational in light of the dramatically increased costs and technical dubiousness of supplying the South Project with substitute utilities.  In addition, the Plaintiffs' comments highlighted Enefit's acknowledgments that many of the supposed substitute utilities were speculative, and technically and economically infeasible.  Yet BLM undertook no independent analysis of the technical and economic feasibility of Enefit's supposed substitute utilities.  And BLM undertook no independent analysis of whether the infeasibility of the substitute utilities would prevent Enefit from developing the South Project or change the oil shale development's scope or timing.

88.     Instead of remedying the FEIS's flaws, BLM issued a record of decision on September 26, 2018, granting Enefit and Moon Lake Electric Association the five utility rights-of-way.

V.      **Consultation and Conferral under the ESA**

A.      **BLM's Biological Assessment**

89.     In May 2018, shortly before publishing its final EIS, BLM issued a biological assessment for the rights-of-way, along with a Request to Initiate Section 7 Consultation and Conference with the Service.  BLM requested formal consultation for the four endangered Upper Colorado River fish species—the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail chub.  BLM also requested the Service' concurrence with BLM's determination that the Utility Project was not likely to jeopardize the Graham's penstemon and White River penstemon.

90.     Consistent with its draft EIS, BLM's biological assessment acknowledged that Enefit's plan to supply water to the South Project, by withdrawing up to 10,867 afy from the

Green River and pumping it through the Utility Project's water pipeline, was a reasonably foreseeable future activity, and thus BLM and the Service should analyze the depletion as a cumulative effect of the rights-of-way. Yet the biological assessment failed to analyze the impact of this substantial depletion on the four fish species.

91.     Additionally, the biological assessment acknowledged that a natural gas or oil product pipeline spill is an indirect effect or a reasonably foreseeable cumulative effect of the rights-of-way, given that both pipelines will cross the White River, Evacuation Creek, and several ephemeral tributaries. Yet BLM failed to analyze the impact of a spill on the four fish species.

92.     BLM also conceded that sediment loading into surface water from the South Project's mining operation is a reasonably foreseeable cumulative effect of the rights-of-way. Yet again, the biological assessment failed to analyze the impact of sedimentation on the fish species.

93.     As to the impacts on the two penstemons plant species proposed for listing under the ESA, the biological assessment neglected to analyze Enefit's South Project mining development, focusing instead only on the narrow ground disturbance from constructing the Utility Project.

**B.      The Service's Biological Opinion**

94.     In response to BLM's initiation of section 7 consultation, the Service issued a BiOp in July 2018.

95.     The BiOp's discussion of the endangered fish species addresses only the impacts from Enefit's 8.5 acre-foot withdrawal from the Green River, which is merely the amount of

water required to construct and maintain the pipelines and other rights-of-way facilities.  It includes no discussion of the impacts to the four fish species from Enefit's *operation* of the water pipeline to withdraw up to 10,867 acre-feet (or 3.5 billion gallons) per year from the Green River.  In other words, the Service analyzed the impact on the fish species from building the water pipeline, but not from operating it.

96.     The BiOp also contained no discussion of the impacts on the fish species from a natural gas or oil product pipeline spill.  And it did not discuss the sedimentation and leachate impacts on the four fish species that could be caused by precipitation permeating the hundreds of millions of tons of waste rock generated at the South Project.

97.     Finally, the BiOp included the Service's concurrence with BLM's conclusion that the rights-of-way are not likely to jeopardize the continued existence of the two penstemon species or adversely modify their habitat.  But like BLM's biological assessment, the BiOp analyzed only the Utility Project's narrow construction footprint, entirely ignoring the impacts to the plant species from the South Project's about 9,000-acre ground disturbance.

98.     In fact, the Service drew the "action area" of the BiOp, within which it constrained its impacts analysis, to exclude the South Project area.

## VI.     Additional BLM Actions Linked to the Rights-of-Way

99.     The South Project's on-site oil shale processing plant is the heart of Enefit's planned oil shale operations in Utah.  In addition to processing the more than 28 million tons of oil shale per year that it plans to mine from the South Project's approximately 9,000-acre site, Enefit also plans to use the South Project's processing plant to process the oil shale it mines both from its neighboring RD&D and Preferential Leases and from a neighboring Indemnity Selection

parcel.

A.   **Enefit's RD&D and Preferential Leases**

100.   Enefit's RD&D lease allows the company to mine the oil shale on a 160-acre parcel of BLM-administered land, with the intent of swelling the lease up to a 5,120-acre commercial Preferential Lease if Enefit can demonstrate that it can produce commercial quantities of oil by running the recovered oil shale through its Enefit280 retorting technology.

101.   The Preferential Lease abuts the company's South Project landholdings and is crossed by all five utility rights-of-way.

102.   If Enefit successfully converts its RD&D lease into the 5,120-acre Preferential Lease, company documents disclose that it intends to mine that tract's oil shale and run it through the South Project's processing plant, utilizing the water, natural gas, and oil product pipelines, transmission lines, and access road that BLM approved when it granted the rights-of-way to Enefit.  Enefit plans to mine the Preferential Lease and the South Project site under a single integrated development timeline.

103.   While BLM's draft EIS acknowledged that the RD&D and Preferential Leases would have cumulative impacts with the rights-of-way, it contained no quantitative analysis, and little to no qualitative analysis of their environmental impacts.

104.   In comments on the draft EIS, Plaintiffs asserted that NEPA required BLM to analyze the RD&D and Preferential Leases' environmental impacts as indirect effects, or at least as cumulative effects of the Utility Project.

105.   BLM stated in the FEIS that it assumed Enefit would be granted the Preferential Lease and would mine the parcel for oil shale.  BLM conceded that Enefit's mining of this

30

adjacent 5,120-acre site was a reasonably foreseeable future action, and a cumulative effect, to be analyzed together with the rights-of-way.  But even though Enefit's mining of the Preferential Lease would result in a nearly-60 percent increase in oil shale mining in addition to the 9,000-acre South Project mine site, the FEIS lacked any detailed cumulative impacts analysis of the Preferential Lease.

**B.    State of Utah's Indemnity Selection of the Z-Parcel and Lease to Enefit**

106.    Enefit also plans to mine oil shale at an additional neighboring parcel and process it at the South Project plant.

107.    In 2013, the state of Utah, through the School and Institutional Trust Lands Administration, filed with BLM a "Petition for Classification/State Application for Indemnity Selection" for a 440-acre parcel of BLM land—dubbed the "Z-parcel" owing to its shape.  The Z-parcel is completely surrounded by the South Project property and adjacent to Enefit's planned mining operation and processing plant.  *See* Figure 1, *infra*.

108.    Indemnity selections allow states to obtain federal property in lieu of lands they were entitled to, but could not, obtain at statehood.  On entering the Union, some states were given several predetermined sections of each township of federal land within their borders.  But some of the lands to which states were thereby entitled were held in federal reservations (including tribal reservations and military posts) or otherwise were unavailable for transfer to the states.  To rectify this deficit, federal law permits states to select parcels of federal lands (with some restrictions) of roughly equivalent value to those otherwise unavailable to the state due to their inclusion in reservations.  43 U.S.C. §§ 851–52; 43 C.F.R. Part 2621.

109.    Utah is seeking ownership of the Z-parcel through the indemnity-selection

process at the express behest of Enefit, so that the State can lease the land for oil shale development as part of Enefit's South Project.  The Z-parcel is completely surrounded by the South Project property and is part of Enefit's South Project integrated mining plan.  Enefit would process the Z-parcel's recovered oil shale at the South Project, using the Utility Project's water, natural gas, electricity, access road, and oil product pipeline.

110.    Since at least 2015, BLM has known that the State sought ownership of the Z-parcel through the indemnity-selection process for the express purpose of leasing the parcel to Enefit for oil shale development and processing as part of the South Project.  BLM knew that Enefit's mining and processing of the Z-parcel's oil shale would use the rights-of-way.  BLM's separate NEPA reviews of the indemnity selection, the Utility Project, and the RD&D lease extension all coincided, and Enefit timed and sited all three projects to be part of the planned South Project.

111.    In the FEIS analyzing the Utility Project, BLM assumed that ownership of the Indemnity Selection/Z-parcel would be transferred to the state of Utah, that Utah would lease it to Enefit for oil shale mining, and that mining on the Z-parcel was a reasonably foreseeable future action.  BLM asserted that it subsumed the cumulative impacts analysis of mining the Indemnity Selection and processing its oil shale at the South Project into the FEIS's cumulative impacts analysis of the South Project.  The FEIS, however, did not analyze the Indemnity Selection as a cumulative or similar action.

112.    Figure 1 below shows the location of the utility rights-of-way, the South Project, the RD&D and Preferential Leases, and the Z-parcel Indemnity Selection.



**Figure 1: Enefit's holdings and rights-of-way**

Map 1-1: Utility Project Study Area
ENEFIT AMERICAN OIL UTILITY CORRIDOR PROJECT EIS

## FIRST CAUSE OF ACTION
### (NEPA – BLM Failed to Analyze the Indirect Effects of Granting the Rights-of-Way)

113.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

114.    In preparing an EIS, BLM must analyze all indirect effects of the proposed action. 40 C.F.R. § 1502.16(b).  Indirect effects are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

115.    BLM acknowledged in the FEIS that the South Project oil shale development is reasonably foreseeable, and there is no question that the South Project would occur later in time than BLM's approval of the Utility Project.  Yet BLM nonetheless concluded that the South Project's impacts are not indirect effects of granting the rights-of-way to Enefit, based on its assumption that Enefit will build the South Project even without the rights-of-way.  In other words, BLM's assumption that Enefit will build the South Project even without the rights-of-way is BLM's rationale for concluding that the South Project's impacts are not "caused by" the rights-of-way.

116.    BLM's assumption that Enefit would build the South Project without the rights-of-way merely parroted Enefit's unsubstantiated assurances that the South Project would move forward, undiminished in scale, with substitute sources water, natural gas, electricity, and oil product transport.  That assumption does not reflect any independent technical or economic feasibility analysis by BLM.  And Enefit's own statements to BLM admitting the infeasibility of many of the supposed substitute utility supplies contradict BLM's conclusion.  Accordingly, BLM's assumption of full South Project buildout absent the rights-of-way, and its resulting determination that the South Project's impacts are not caused by—and are not indirect effects of—the rights-of-way lacks any rational basis and is arbitrary, capricious, and an abuse of

34

discretion.

117.     BLM's failure to analyze the South Project's impacts as indirect effects of the
rights-of-way in the FEIS therefore rendered its approval of the rights-of-way arbitrary,
capricious, an abuse of discretion, and not in accordance with NEPA and its regulations, in
violation of the APA.  5 U.S.C. § 706(2)(A).

<u>**SECOND CAUSE OF ACTION**</u>
(NEPA – BLM Failed to Take a Hard Look at the South Project's Impacts)

118.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

119.     NEPA mandates that federal agencies take a "hard look" at the impacts of a
proposed action, which requires quantitative or detailed analysis of the action's direct, indirect,
and cumulative effects.  40 C.F.R. § 1508.8; *Robertson*, 490 U.S. at 350.

120.      BLM must take a hard look at the South Project's impacts regardless of whether
the agency considers the impacts to be indirect effects or cumulative effects.

121.     The FEIS includes only a cursory, qualitative discussion of the South Project's
impacts on climate change, air quality, soil resources, surface water and groundwater resources,
the four endangered Upper Colorado River fish species, the penstemon plant species, and other
resources.  It contains a similarly limited discussion of the unique impacts to surface water and
the four endangered fish species from a natural gas or oil product pipeline spill along the Utility
Project's route, or from depleting up to 10,867 afy from the specific points on the Green River
that Enefit will use to divert water through the Utility Project's water pipeline.   And it lacked
any analysis, qualitative or otherwise, of the climate, air quality, and other impacts from end-use
combustion of the synthetic oil carried by the Utility Project's oil product pipeline.

122.     BLM's limited discussion of both the South Project's impacts, and the impacts

from operating the water, natural gas, and oil product pipelines, failed to satisfy the "hard look" standard.  Thus, BLM's approval of the rights-of-way was arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its regulations, in violation of the APA, 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
(NEPA – BLM Failed to Satisfy 40 C.F.R. § 1502.22 for "Unavailable" Information)

123.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

124.    40 C.F.R. § 1502.22(a) provides that the agency "shall" include incomplete or apparently unavailable information in an EIS if both: (i) the information "is essential to a reasoned choice among alternatives" and (ii) the costs of obtaining the information are not "exorbitant."

125.    In the FEIS, BLM justified its limited analysis of the South Project's environmental impacts by claiming that detailed information about the South Project is unavailable.  Citing 40 C.F.R. § 1502.22, BLM claimed both that incomplete South Project information is not essential to a reasoned choice among alternatives and that the costs of obtaining the information are exorbitant.

126.    BLM's contention that the incomplete South Project information is not essential to a reasoned choice among alternatives is based on its unfounded assumption that, under the no-action alternative, Enefit would build the South Project, undiminished in scale, even without the rights-of-way.  Because that assumption is arbitrary, capricious, and an abuse of discretion, so too is BLM's contention that the incomplete information is not essential to a reasoned choice among alternatives.

127.    BLM also lacked any rational basis to conclude that obtaining the incomplete

information would be cost prohibitive.  BLM stated in the FEIS, based on assurances from Enefit, that Enefit has only completed preliminary and conceptual South Project engineering designs due to the different design requirements with and without the rights-of-way.  According to Enefit, and parroted by BLM, it would be cost prohibitive to design and engineer the entire South Project twice—once with the Utility Project and once with substitute utilities—and the company is unwilling to expend any further resources to develop a mine plan or engineering specifications until BLM decides whether to approve the rights-of-way.

128.    Prior to issuing the FEIS, however, Enefit informed BLM that the scope of facilities at the South Project would be the same with or without the rights-of-way, and that there would be little, if any, material difference in the South Project's design between the two scenarios.  Plus, Enefit already knows many, if not all, relevant details about its Enefit280 retorts and upgrading units planned for the South Project's processing plant, as well as the South Project's water, natural gas, and electricity demand, total acres to be mined, projected oil product output, and other details.

129.    But even assuming that the costs of obtaining detailed South Project information are exorbitant, BLM nonetheless failed to comply with 40 C.F.R. § 1502.22(b)'s requirements for incomplete, but cost-prohibitive, information.  The FEIS fails to identify the relevance of the unavailable South Project information to evaluating impacts, summarize existing credible scientific evidence relevant to evaluating the South Project's impacts, or evaluate the South Project's impacts based on generally accepted theoretical approaches or research methods.

130.    Because BLM failed to satisfy 40 C.F.R. § 1502.22, that regulation does not excuse the FEIS's failure to take a hard look at the South Project's impacts.  Thus, BLM's

approval of the rights-of-way based on the defective FEIS is arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its regulations, in violation of the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION
(NEPA – BLM Failed to Consider a True No-Action Alternative)

131.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

132.     An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," including the no-action alternative.  40 C.F.R. § 1502.14(a), (d).

133.     The FEIS's no-action alternative assumed that the South Project will proceed to full buildout, undiminished in scale, if BLM were to deny the rights-of-way, with substitute sources of water, natural gas, electricity, and oil product transport.  It does not reflect any independent technical or economic feasibility analysis by BLM.  Because BLM's assumption that Enefit would fully build out the South Project absent the rights-of-way lacks any rational basis and is arbitrary, capricious, and an abuse of discretion, so too is BLM's no-action alternative based on that assumption.

134.     NEPA's mandate to consider a no-action alternative is intended to require agencies to compare the impacts of the proposed action to the known impacts of maintaining the status quo, or the current level of activity.  By assuming, without any rational basis, that the South Project would proceed to full buildout without the utility rights-of-way, BLM failed to consider a "true" no-action alternative, wherein the agency would deny the rights-of-way and Enefit would not fully develop the South Project.

135.     Accordingly, BLM based the FEIS on an unlawfully narrow range of alternatives, which predetermined the outcome of the NEPA process by only considering alternatives that

assumed the existence of the most significant effect of granting the rights-of-way—Enefit's

South Project oil-shale mine and processing plant.

136.    The FEIS's failure to consider a true no-action alternative therefore rendered

BLM's approval of the rights-of-way arbitrary, capricious, an abuse of discretion, and not in

accordance with NEPA and its regulations, in violation of the APA, 5 U.S.C. § 706(2)(A).

### FIFTH CAUSE OF ACTION
(NEPA – BLM Failed to Take a Hard Look at the Impacts of the No-Action Alternative)

137.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

138.    Even supposing that BLM had a rational basis to assume the South Project would

proceed to full buildout, undiminished in scale, under the no-action alternative of denying the

rights-of-way, BLM nonetheless failed to take a hard look at the impacts that would result from

choosing the no-action alternative.

139.    Although BLM assumed that Enefit would supply the South Project with

substitute sources of water, natural gas, electricity, and oil product delivery if it denied the rights-

of-way, the FEIS fails to include a detailed analysis of the impacts of these substitute utilities and

the South Project's impacts with these substitute utilities.  Nor did BLM include a detailed

analysis of the tradeoffs between granting and denying the rights-of-way, which BLM asserted

would lead the South Project to have different impacts.

140.    Therefore, even assuming the South Project would proceed to full buildout with

substitute utility supplies, the FEIS's failure to take a hard look at the impacts of the no-action

alternative rendered BLM's approval of the rights-of-way arbitrary, capricious, an abuse of

discretion, and not in accordance with NEPA and its regulations, in violation of the APA, 5

U.S.C. § 706(2)(A).

**SIXTH CAUSE OF ACTION**
(NEPA – BLM Failed to Take a Hard Look at the Cumulative Impacts of the RD&D and
Preferential Leases)

141.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

142.    NEPA requires agencies to disclose and analyze cumulative effects.  40 C.F.R. §§
1508.7–1508.8, 1508.25(c)(3).

143.    BLM assumed in the FEIS that Enefit would be issued and would develop the
RD&D and Preferential Leases and that oil shale mining of the 5,120-acre Preferential Lease was
a reasonably foreseeable future action.  Indeed, Enefit informed BLM that it intends to mine the
Preferential Lease and South Project site under a single integrated development timeline and run
the Preferential Lease's recovered oil shale through the South Project's processing plant,
utilizing the Utility Project's water, natural gas, electricity, access road, and oil product pipeline.

144.    The FEIS lacked any detailed analysis of the cumulative impacts of mining and
processing the Preferential Lease's oil shale.  The FEIS merely grouped the RD&D and
Preferential Lease into the broader category of reasonably foreseeable future actions, but then
failed to analyze the impacts from such actions.

145.    Accordingly, BLM failed to take a hard look at the cumulative impacts of Enefit
mining and processing the RD&D and Preferential Lease's oil shale resources in the FEIS.
BLM's approval of the rights-of-way therefore is arbitrary, capricious, an abuse of discretion,
and not in accordance with NEPA and its regulations, in violation of the APA, 5 U.S.C. §
706(2)(A).

**SEVENTH CAUSE OF ACTION**
(NEPA – BLM Failed to Analyze the Indemnity Selection as a Cumulative or
Similar Action in the FEIS)

146.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

147.    To avoid the improperly segmented analysis of related actions, NEPA requires BLM to consider multiple proposed actions in a single EIS if they are "cumulative actions" or "similar actions."  40 C.F.R. § 1508.25(a)(2)–(3).  Cumulative actions are those that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2).  Similar actions are those that, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." *Id.* § 1508.25(a)(3).

148.    The timing, geography, purpose, scope, and impacts of the Utility Project, Indemnity Selection, and South Project are all intimately intertwined.  BLM assumed in the FEIS that ownership of the Indemnity Selection Z-parcel would be transferred to the state of Utah, that the Indemnity Selection would be leased to Enefit for oil shale mining, and that this mining was a reasonably foreseeable future action.  Indeed, BLM has known for years that Utah is seeking ownership of the Indemnity Selection for the express purpose of leasing it to Enefit, which plans to mine the Z-parcel and process the oil shale recovered there at the South Project plant.  Only a mile separates the Indemnity Selection from the Utility Project's terminus at the South Project processing plant.  Moreover, BLM's NEPA review of the Utility Project and Indemnity Selection applications coincided, and the agency will complete both reviews before Enefit breaks ground on the South Project.

149.    The Indemnity Selection is both a cumulative action and a similar action to the Utility Project, which BLM must analyze in full in the Utility Project EIS.

150.    The FEIS's failure to analyze the Indemnity Selection together in the same NEPA

document as the Utility Project as a cumulative and similar action rendered BLM's approval of

the Utility Project rights-of-way arbitrary, capricious, an abuse of discretion, and not in

accordance with NEPA and its regulations, in violation of the APA.  5 U.S.C. § 706(2)(A).

**EIGHTH CAUSE OF ACTION**

(ESA – Service Failed to Analyze Indirect Effects, Interdependent and Interrelated Actions, and
Cumulative Effects)

151.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

152.    In its biological opinion determining whether a proposed action is likely to

jeopardize the continued existence of listed species or result in the destruction or adverse

modification of critical habitat, the Service must independently analyze the "effects of the

action"—including the action's "indirect effects" and effects of "interrelated or interdependent

activities"—and the "cumulative effects" on listed species or critical habitat.  50 C.F.R. §§

402.02, 402.14(g).  In addition, the "action area" within which the Service must analyze a

proposed action's impacts must include all areas "indirectly" affected by the action.  *Id.* §

402.02.

153.    The Service's BiOp on the Utility Project's impacts on the four endangered Upper

Colorado River fish species failed to analyze the indirect effects of BLM's approval of the

Utility Project.  The BiOp analyzed only Enefit's minimal 8.56 acre-foot withdrawal from the

Green River, which is merely the amount of water required to construct and maintain the Utility

Project's pipelines, transmission lines, and access road.  The BiOp failed to consider or address

the impacts from using the water pipeline to deplete up to 10,867 afy from of the Green River,

the impacts from natural-gas or oil-product pipeline spills, or the impacts from the South Project

42

site's sedimentation and leachate.

154.    Depleting the Green River via the Utility Project's water pipeline, and spills from its natural-gas and oil-product pipelines, are indirect effects of BLM's approval of the Utility Project because they are caused by the proposed action, occur later in time, and are reasonably certain to occur.  *Id.* § 402.02.  Because Enefit claims it would obtain water from other sources if BLM denied the Utility Project, the 10,867 afy depletion of the Green River at the proposed points of diversion, and that depletion's unique impacts on the fish species, would not occur if not for the water pipeline.  Likewise, because Enefit claims it could use means other than the Utility Project's pipelines to transport natural gas and oil product, spills from those pipelines, and the resulting environmental impacts, would not occur but for BLM's approval of the Utility Project.  In both cases, the effects would occur after BLM approves the Utility Project and Enefit constructs the pipelines.  And because the pipelines' raison d'être is to transport water, natural gas, and oil product to and from the South Project, it is reasonably certain Enefit will operate the pipelines it sought approval to build.

155.    In addition, the effects of Enefit's operation of the water, natural gas, and oil product pipelines must be analyzed because its operation is also interrelated or interdependent with BLM's approval of the Utility Project because Enefit would not operate them but for BLM's approval of the Utility Project.

156.    Alternatively, even if the effect of operating the pipelines is not an indirect effect, or an effect of an interrelated or interdependent activity, Enefit's operation of the pipelines and the resulting impact is a cumulative effect of the Utility Project, for it is "reasonably certain" Enefit will operate the pipelines it sought approval to build.  *Id*.

43

157.    The Service's failure to analyze the impacts on the four endangered fish species from Enefit's operation of the Utility Project's water, natural gas, or oil product pipelines thus renders the BiOp arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA and its regulations, in violation of the APA.  5 U.S.C. § 706(2)(A).

158.    Moreover, Enefit's South Project will cause impacts to surface water that are the indirect effects of BLM's approval of the Utility Project.  Because the "action area" within which the Service must analyze a proposed action's impacts includes all areas "indirectly" affected by the action, the Service improperly excluded the South Project site from the BiOp's action area. 50 C.F.R. § 402.02.

159.    The South Project's oil shale mining operations will produce hundreds of millions of tons of waste rock potentially containing salts, metals, and hydrocarbons, which may enter nearby surface waters.  By disturbing about 9,000 acres, the South Project will also cause soil erosion that could push sediment and dissolved salt into nearby surface water.  The South Project's sedimentation and leachate impacts on surface water are indirect effects of BLM's approval of the Utility Project.  Enefit's South Project is caused by the Utility Project because Enefit would not develop the South Project—at least as currently proposed in scale and design— but for the Utility Project.  There is no rational basis to conclude otherwise.  South Project oil shale mining and processing will also occur after Utility Project construction, and, as Enefit admits, is reasonably certain to occur.  *Id.*  Therefore, the Service was required to include the South Project site in the BiOp's action area and consider its effects in analyzing the proposed action's impacts.  *Id.*

160.    The South Project and its resulting sedimentation and leachate are also

interrelated to, or interdependent with, BLM's approval of the rights-of-way because the South

Project either would not occur but for BLM's approval of the rights-of-way, or it would be

different in scale and impact if Enefit obtained substitute utilities absent the rights-of-way.

161.    Alternatively, Enefit's admittedly reasonably-certain development of the South

Project, and the resulting sedimentation and leachate, is at least a cumulative effect of the rights-

of-way.

162.    The Service's exclusion of the South Project from the BiOp's "action area" and

failure to analyze, or even mention, the South Project's sedimentation and leachate impacts on

the four endangered fish species, therefore renders the BiOp arbitrary, capricious, an abuse of

discretion, and not in accordance with the ESA and its regulations, in violation of the APA, 5

U.S.C. § 706(2)(A).

## NINTH CAUSE OF ACTION
(ESA – BLM Violated Section 7(a)(2)'s Duty to Ensure No Jeopardy or Adverse Modification)

163.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

164.    Section 7(a)(2) of the ESA prohibits BLM from undertaking actions that are

"likely to jeopardize the continued existence" of any listed species or "result in the destruction or

adverse modification" of their critical habitat.  16 U.S.C. § 1536(a)(2).  In addition to the direct

effects of the proposed action, BLM must ensure that the "indirect effects" and effects of

"interrelated or interdependent" activities, together with "cumulative effects" of the action, are

not likely jeopardize a listed species or adversely modify their critical habitat.  50 C.F.R. §§

402.14, 402.02.

165.    BLM's reliance on a legally flawed biological opinion in approving a proposed

action violates its section 7(a)(2) obligation.

166.    As detailed above, the Service's BiOp was arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA because it failed to analyze the impacts on the four endangered fish species from the water pipeline's 10,867 afy depletion of the Green River, from a natural gas and oil product pipeline spill, and from the South Project's sedimentation and leachate.  BLM's reliance on the Service's legally flawed BiOp therefore renders its record of decision approving the utility rights-of-way arbitrary, capricious, an abuse of discretion, and in violation of ESA section 7(a)(2).  16 U.S.C. § 1536(a)(2).

167.    BLM also violated its section 7(a)(2) duty based on the Service's findings as part of the Upper Colorado River RIPRAP program.  According to the Service, if a proposed action's direct effects, indirect effects, or effects of interrelated or interdependent activities will result in the depletion of the Upper Colorado River Basin, that action presumptively is likely to jeopardize the continued existence of the four fish species or adversely modify their habitat, unless RIPRAP's measures—including payment of a depletion fee and other mitigation measures—are fully implemented as part of the proposed action or as a reasonable and prudent alternative.

168.    Here, because the BiOp failed to analyze the Utility Project's up-to-10,867 afy depletion of the Green River in the context of RIPRAP, and RIPRAP's measures were not implemented as part of the Utility Project or as a reasonable and prudent alternative, that depletion presumptively is likely to jeopardize the four fish species or adversely modify their critical habitat.  In approving the rights-of-way, BLM therefore violated section 7(a)(2)'s mandate to ensure the rights-of-way are not likely to jeopardize the continued existence of the four fish species or adversely modify their critical habitat.  *Id.*

## TENTH CAUSE OF ACTION

(ESA – BLM and the Service Violated Section 7(a)(4)'s Duty to Confer on Proposed Species)

169.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

170.    BLM's biological assessment concluded that the utility rights-of-way are not likely to jeopardize the continued existence of the penstemon plant species proposed for listing, or destroy or adversely modify their proposed critical habitat.  As a result, BLM requested the Service's concurrence with its no-jeopardy determination rather than initiate informal discussions and seek the Service's advisory recommendations on ways to minimize or avoid adverse impacts to the penstemon species.  *See* 50 C.F.R. §§ 402.10(c), 402.12(k)(1).

171.    The biological assessment's no-jeopardy determination was based only on BLM's analysis of the Utility Project's narrow ground disturbance and its drawing of the "action area" to exclude the South Project site.  BLM failed to analyze the South Project's destruction of penstemon habitat as an indirect effect of the utility rights-of-way, or an interrelated or interdependent activity.

172.    In turn, the Service concurred with BLM's no-jeopardy determination, but likewise failed to analyze the South Project's destruction of penstemon habitat as an indirect effect of the utility rights-of-way, or an interrelated or interdependent activity.  The Service also based its concurrence on an "action area" that improperly excluded the South Project site.

173.    Therefore, BLM's determination in its biological assessment, and the Service's concurrence in its BiOp, that the Utility Project is not likely to jeopardize the two penstemon species proposed for listing or adversely modify their proposed critical habitat was arbitrary, capricious, and not in accordance with the ESA and its regulations, in violation of the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Declare that BLM's FEIS and record of decision approving the Utility Project rights-of-way are arbitrary, capricious, and not in accordance with NEPA and its regulations, in violation of the APA, 5 U.S.C. § 706(2)(A);

B.      Declare that the Service's BiOp is arbitrary, capricious, and not in accordance with the ESA and its regulations, in violation of the APA, *id.*;

C.      Declare that BLM violated ESA section 7(a)(2)'s prohibition on undertaking actions that are "likely to jeopardize the continued existence" of the four endangered Upper Colorado River fish species or "result in the destruction or adverse modification" of their critical habitat, 16 U.S.C. § 1536(a)(2);

D.      Declare that BLM's determination in its biological assessment, and the Service's concurrence in its BiOp, that the Utility Project is not likely to jeopardize the two penstemon species proposed for listing or destroy or adversely modify their proposed critical habitat, are arbitrary, capricious, and not in accordance with the ESA and its regulations, in violation of the APA, 5 U.S.C. § 706(2)(A);

E.      Vacate and set aside the Service's BiOp;

F.      Vacate and set aside BLM's September 2018 record of decision approving the Utility Project rights-of-way;

G.      Vacate federal rights-of-way UTU-89451, UTU-89452, UTU-89449, UTU-89453, and UTU-19398.

H.      Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the ESA, 16

U.S.C.§ 1540(g); and

I.      Grant Plaintiffs such further relief as may be just, proper, and equitable.


DATED this 16th day of May, 2019.

                              Respectfully submitted,

                              /s/ Heidi McIntosh
                              Heidi McIntosh
                              Michael Hiatt
                              Alex Hardee
                              Earthjustice
                              633 17th Street, Suite 1600
                              Denver, CO 80202
                              303-623-9466
                              hmcintosh@earthjustice.org
                              ahardee@earthjustice.org
                              mhiatt@earthjustice.org

                              *Attorneys for Living Rivers, Grand Canyon Trust,*
                              *Center for Biological Diversity, Natural Resources*
                              *Defense Council, Sierra Club, Waterkeeper*
                              *Alliance, Inc., Colorado Riverkeeper, and Utah*
                              *Physicians for a Healthy Environment*


                              Michael Toll
                              Grand Canyon Trust
                              4404 Alcott Street
                              Denver, CO 80211
                              303-309-2165
                              mtoll@grandcanyontrust.org

                              *Attorney for Grand Canyon Trust*

49

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
303-641-3149
tzukoski@biologicaldiversity.org

*Attorney for Center for Biological Diversity*