JEAN E. WILLIAMS, Deputy Assistant Attorney General
CAITLIN CIPICCHIO
RICKEY TURNER
U.S. Department of Justice
Environment & Natural Resources Division
150 M St., N.E.
Washington, DC 20002
(202) 305-0503
caitlin.cipicchio@usdoj.gov
rickey.turner@usdoj.gov
*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LIVING RIVERS, *et al.*, | Case No. 4:19-CV-00041-DN-PK |
| Plaintiffs, | |
| v. | |
| DAVID BERNHARDT, Secretary of the Interior, *et al.*, | **FEDERAL DEFENDANTS' ANSWER BRIEF** |
| Federal Defendants, | |
| and ENEFIT AMERICAN OIL CO., | Judge David Nuffer<br>Magistrate Judge Paul Kohler |
| Intervenor-Defendant. | |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.      Legal Background ............................................................................ 2

          A.      National Environmental Policy Act ........................................ 2

          B.      Endangered Species Act ....................................................... 3

    II.     Factual Background .......................................................................... 4

STANDARD OF REVIEW ........................................................................................... 8

ARGUMENT ................................................................................................................ 9

    I.      BLM's determination regarding the South Project's buildout was not arbitrary and capricious........................................................................ 10

          A.      The Record supports BLM's assumption that the South Project would occur without the Utility Project..................................... 10

                  1.      The Record shows alternative methods of transportation would suffice for Enefit's purposes if the Utility Project was denied. ..................................................................... 12

                  2.      The Record shows an alternative water supply could support the South Project if the Utility Project was not approved............. 14

                  3.      The Record shows Enefit had alternative means of obtaining the necessary natural gas supply for the South Project without the natural gas pipeline right-of-way. .............................. 15

          B.      BLM repeatedly challenged Enefit's assertions regarding the South Project's dependence on the Utility Project................................ 16

          C.      BLM's no action alternative complied with NEPA.................................. 19

    II.     BLM appropriately analyzed the indirect effects of the Utility Project under NEPA. ................................................................................ 20

          A.      BLM properly analyzed the difference in effects of the South Project with and without the Utility Project's Approval...................................... 21

          B.      Any failure to label the indirect effects analysis as such does not invalidate the FEIS or ROD....................................................... 22

III.     BLM took a hard look at the South Project's impacts. ......................................... 23

     A.     BLM took a hard look at the South Project's water-quality impacts........ 24

     B.     BLM took a hard look at the South Project's air emissions and greenhouse gas emissions effects............................................................... 26

IV.     The Service and BLM properly analyzed the effects of the Utility Project on listed species in compliance with the ESA. .......................................................... 29

     A.     The Service's decision to consider the South Project's potential mining effects on endangered Colorado River fish as cumulative effects was reasonable............................................................................. 30

     B.     Plaintiffs have not demonstrated the Service's "cumulative effects" analysis or decision to be unreasonable .................................................... 32

          1.     The Service properly considered the South Project's potential effects as cumulative effects. ......................................... 33

          2.     To comply with the ESA, the South Project must undergo its own environmental review under ESA. ........................................ 36

          3.     The Service's cumulative effects analysis of the South Project's potential to increase contamination was reasonable....... 37

V.     BLM appropriately analyzed the impacts of the RD&D and preferential leases. ................................................................................................................ 38

CONCLUSION.................................................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*Am. Rivers v. Fed. Energy Reg. Comm'n,*
  895 F.3d 32  (D.C. Cir. 2018) ....................................................................... 18, 37

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
  462 U.S. 87 (1983) ............................................................................................. 3

*Cmtys., Inc. v. Busey,*
  956 F.2d 619 (6th Cir. 1992) ........................................................................... 20

*Colo. Envtl. Coal. v. Dombeck,*
  185 F.3d 1162 (10th Cir. 1999) ....................................................................... 23

*Colo. Envtl. Coal. v. Off. of Legacy Mgmt.,*
  819 F. Supp. 2d 1193 (D. Colo. 2011) ............................................................ 39

*Colo. Wild v. U.S. Forest Serv.,*
  435 F.3d 1204 (10th Cir. 2006) .................................................................... 9, 17

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ........................................................................................... 8

*Envt'l Law & Policy Ctr. v. U.S. Nuclear Reg. Comm'n,*
  470 F.3d 676 (7th Cir. 2006) ........................................................................... 19

*Grand Canyon Tr. v. FAA,*
  290 F.3d 339 (D.C. Cir. 2002) ........................................................................... 3

*Greater Yellowstone Coal. v. Flowers,*
  359 F.3d 1257 (10th Cir. 2004) .................................................................. 26, 27

*Hammond v. Norton,*
  370 F. Supp. 2d 226 (D.D.C. 2005) ............................................................ 17, 18

*High Country Conservation Advoc. v. U.S. Forest Serv.,*
  52 F. Supp.3d 1174 (D. Colo. 2014) ........................................................... 29, 32

*Hughes River Watershed Conservancy v. Johnson,*
  165 F.3d 283 (4th Cir. 1999) ........................................................................... 28

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ........................................................................... 2, 3, 9, 26

*Morris v. U.S. Nuclear Reg. Comm'n,*
  598 F.3d 677 (10th Cir. 2010) ......................................................................... 29

*Nashvillians Against I-440 v.Lewis,*
  524 F.Supp. 962 (M.D. Tenn. 1981) ................................................................ 19

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,*
  565 F.3d 683 (10th Cir. 2009) ....................................................................... 8, 9

*Oceana v. Bureau of Ocean Energy Mgmt.*,
　37 F. Supp. 3d 147 (D.D.C. 2014) ................................................................. 20

*Robertson v. Methow Valley Citizens Council*,
　490 U.S. 332 (1989) ........................................................................... 2, 23, 25

*San Juan Citizens All. v. Stiles*,
　654 F.3d 1038 (10th Cir. 2011) ................................................................ 17, 26

*Sierra Club v. Bureau of Land Mgmt*,
　786 F.3d 1219 (9th Cir. 2015) ................................................................. 34, 35

*Sierra Club v. Marsh*,
　976 F.2d 763 (1st Cir. 1992) ........................................................................ 38

*Sierra Club v. U.S. Dep't of Energy*,
　867 F.3d 189 (D.C. Cir. 2017) ....................................................................... 3

*Simmons v. U.S. Army Corps of Eng'rs*,
　120 F.3d 664 (7th Cir. 1997) ........................................................................ 18

*Theodore Roosevelt Conservation P'ship v. Salazar*,
　605 F. Supp. 2d 263 (D.D.C. 2009) ............................................................... 28

*Utah Envtl. Cong. v. Bosworth*,
　443 F.3d 732 (10th Cir. 2006) ........................................................................ 9

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
　305 F.3d 1152 (10th Cir. 2002) ..................................................................... 38

*Wyoming v. U.S. Dep't of Agric.*,
　661 F.3d 1209 (10th Cir. 2011) ...................................................................... 9

*Young v. Gen. Serv. Admin.*,
　99 F. Supp. 2d 59 (D.D.C. 2000) .................................................................. 20

**Statutes**

16 U.S.C. § 1531(b) ....................................................................................... 3

16 U.S.C. § 1536(a)(2) ............................................................................... 3, 38

16 U.S.C. § 1536(b)(4) ................................................................................... 4

16 U.S.C. § 1536(o)(2) ................................................................................... 4

16 U.S.C. § 1540(e)(1) ................................................................................. 37

42 U.S.C. § 4321 ..................................................................................... 2, 23

42 U.S.C. § 4332 ................................................................................... 2, 3, 23

42 U.S.C. § 4332(2)(C)(i) .............................................................................. 3

43 U.S.C. §§ 1761-65 ................................................................................... 6

5 U.S.C. §§ 701–706 ..................................................................................... 8

**Regulations**

40 C.F.R. § 1501.1 ....................................................................................... 2

40 C.F.R. § 1502.14(d) ............................................................................... 19

40 C.F.R. § 1502.16 ..................................................................................... 3

40 C.F.R. § 1502.3 ....................................................................................... 3

40 C.F.R. § 1506.5(a) ................................................................................. 19

40 C.F.R. § 1508.7 ....................................................................................... 3

40 C.F.R. § 1508.8 ....................................................................................... 3

40 C.F.R. § 1508.8(b) ................................................................................. 21

40 C.F.R. §§ 1500.1-1500.6 ...................................................................... 23

43 C.F.R. § 3900.50 ................................................................................... 39

43 C.F.R. § 3926.10 ................................................................................... 39

50 C.F.R. § 402.02 (2018) ............................................................ 31, 33, 34, 35

50 C.F.R. § 402.14(g) ................................................................................... 4

50 C.F.R. pt. 402 ......................................................................................... 3

**Other Authorities**

59 Fed. Reg. 13,374 (Mar. 21, 1994) ........................................................... 8

84 Fed. Reg. 44,976-01 (Aug. 27, 2019) ...................................................... 3

84 Fed. Reg. 50,333-01 (Sept. 25, 2019) ...................................................... 3

## INTRODUCTION

At issue in this case is the Bureau of Land Management's ("BLM") grant of seven rights-of-way to Intervenor-Defendant Enefit American Oil Co. ("Enefit').  Plaintiffs claim that BLM's analyses of the rights-of-way and their potential impacts violated the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA").  They also allege that the United States Fish and Wildlife Service's ("Service") violated the ESA.  To the contrary, BLM and the Service conducted a thorough decision making process in conformance with the requirements of these statutes and other applicable legal requirements, and Plaintiffs' claims should be rejected.

The challenged Record of Decision ("ROD") authorized Enefit to construct and operate a water supply pipeline, a natural gas supply pipeline, an oil product line, power lines, and road upgrade across BLM- and State-administered lands.  These rights-of-way, collectively, the "Utility Project," will provide utilities and move processed oil from Enefit's South Project.  The South Project is a proposed commercial oil shale mining, retorting, and upgrading operation in Uintah County, Utah that would be owned and operated by Enefit.  BLM made no decisions regarding the South Project in the ROD as the South Project, an entirely privately-owned, proposed development on privately owned land, is outside of BLM's authority for approval.  However, the interconnectedness of the South Project and the Utility Project was an ongoing issue from the initiation of NEPA.  During the NEPA process, Enefit asserted that the South Project would proceed regardless of BLM's decision on the Utility Project rights-of-way.  That assertion is supported by Record evidence, and was continuously questioned and verified by BLM throughout its analysis of the Utility Project.  Ultimately, BLM assumed for the purposes of its analysis that the South Project would proceed to full buildout with or without the Utility

Project.  Plaintiffs take issue with this assumption and ask that the Court ignore Record evidence supporting that assumption, and BLM's expertise in analyzing that evidence.  Plaintiffs also challenge BLM's determination that certain effects of the South Project, which was not the action approved by the ROD, were not quantifiable in the Final Environmental Impact Statement ("FEIS") and thus claim the cumulative effects analysis is flawed.  Plaintiffs cannot directly attack the South Project; they are instead left to attack the environmental analysis of the rights-of-way supporting that Project.  But pursuant to NEPA, BLM appropriately identified and evaluated the environmental effects of the Utility Project.  And, pursuant to the ESA, the Service and BLM properly analyzed the effects of the Utility Project on listed species.  The analysis of the Utility Project was not flawed, and Plaintiffs' allegations to the contrary amount to nothing more than inappropriate "flyspecking" of BLM and the Service's review.  Therefore, the ROD approving the grant of the rights-of-way should be upheld.

## BACKGROUND

### I.   Legal Background

### A.  National Environmental Policy Act

NEPA requires that federal agencies consider the environmental consequences of major federal actions significantly affecting the environment.  *See* 42 U.S.C. § 4321, 4332; 40 C.F.R. § 1501.1.  This consideration serves NEPA's dual purpose of informing agency decision makers of the environmental effects of proposed actions and ensuring that relevant information is made available to the public so that it "may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA's intent is to focus the attention of agencies and the public on a proposed action so its consequences may be studied before implementation. *See* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 370-71 (1989).

To assist in meeting these goals, NEPA requires preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332 (2)(C); 40 C.F.R. § 1502.3. The EIS must examine, among other things, the project's direct, indirect and cumulative impacts. 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

In reviewing agency action for NEPA compliance, courts ensure that agencies have taken a "hard look" at the environmental consequences of their decisions. *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017); *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 340–41 (D.C. Cir. 2002). Judicial review of agency NEPA compliance is deferential. *Marsh*, 490 U.S. at 377. The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983).

## B. Endangered Species Act

Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. pt. 402.[1]

---

[1] On October 28, 2019, new implementing regulations for the ESA went into effect, which redefined some of the relevant Section 7 consultation terms in this case like, for example, "effects of the action." *See* 84 Fed. Reg. 44,976-01, 44,976–78 (Aug. 27, 2019); 84 Fed. Reg. 50,333-01 (Sept. 25, 2019). These revised regulations do not apply here because they are prospective in application and their implementation post-dates the agencies' Section 7 consultation in this case. 84 Fed. Reg. at 44,976.

Formal consultation, which was the process followed here, culminates in a biological opinion ("BiOp"), which includes a "detailed discussion of the effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h)(1)(iii).  The BiOp assesses the likelihood of the proposed action resulting in jeopardy to a listed species or destruction or adverse modification to designated critical habitat.  50 C.F.R. § 402.14(g).  If an action is not likely to result in jeopardy or destruction or adverse modification of critical habitat, but is reasonably likely to result in "take" incidental to the proposed action, then the Service includes an incidental take statement in the BiOp.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i-v).  If the action agency implements the project as proposed and complies with the terms and conditions of the incidental take statement, ESA Section 7(o)(2) exempts the specified level of take from the ESA Section 9 take prohibition.  16 U.S.C. § 1536(o)(2).

## II.    Factual Background

At issue in this case is BLM's environmental review and decision to issue seven rights-of-way to Enefit American Oil ("Enefit") and Moon Lake Electric Association[2] in Uintah County, Utah.  The rights-of-way approved in the ROD, authorize the applicants to construct and operate a 19 miles of a water supply pipeline, 9 miles of a natural gas supply pipeline, 11 miles of an oil product line, two power lines spanning 30 miles, and upgrade and pave 6 miles of Dragon Road (a county road running across BLM and state-administered lands). BLM_00007721; BLM_00007771; BLM_00008823.

The Utility Project (the seven rights-of-way) would provide utilities to and move processed oil from the South Project, a planned commercial oil shale mining, retorting, and

---

[2] Moon Lake Electric Association ("MLEA") was technically the applicant for two of the requested rights-of-way for two power lines, which are part of the proposed project. For simplicity, this brief refers to Enefit as the applicant for all seven right of ways which are collectively known as the Utility Project.

upgrading operation owned by Enefit.  *Id.*  Enefit's South Project is designed to develop a shale mining and oil production complex that would produce approximately 28 million tons of raw oil shale ore rock per year, and 50,000 barrels per day of refinery-ready shale oil at full build-out. BLM_00000578.  This 50,000 barrels per day production is expected to continue for 30 years, using oil shale rock mined from Enefit's private property.  Once mined, the shale oil is hydrotreated onsite to produce a "premium, refinery-ready [synthetic crude oil] product." BLM_00000578.  Originally, construction was slated to start in 2017.  BLM_00000578.  The South Project, including the "mine, retort, and upgrader units" are non-federal actions. BLM_00000583.  BLM lacks authority to approve or disapprove of the South Project "because it is located entirely on private lands and minerals."  BLM_00007771.

Enefit submitted applications to BLM for the pipelines and road upgrade rights-of-way on December 3, 2012 and MLEA submitted its applications for the power lines on April 3, 2013. BLM_00007771.  Based on the scope of the proposed action, BLM determined the Utility Project was a major federal action that required the preparation of an EIS.  BLM_00007002. BLM published a Notice of Intent to Prepare an EIS for the Enefit Utility Corridor Project in the Federal Register on July 1, 2013.  BLM_00006505.  The formal scoping period ended on August 1, 2013, during which two open-house meetings were held in Vernal and Salt Lake City, Utah. BLM_00007009.  During the 30 day period, BLM received a total of 260 scoping submittals from federal, state, and local agencies, special interest groups, corporations, and individuals. BLM_00006534; BLM_00008843.  A draft Environmental Impact Statement ("DEIS") was issued in April 2016 and was open for public comment for 60 days.  BLM_00008516.  During that time, BLM held three public meetings and received 70 substantive comment letters, as well

as over 15,500 form letter comments from eight different organizations.  Plaintiffs[3] submitted

their comments to the DEIS on June 14, 2016.  BLM_00002463.  BLM's responses to the

comments are contained in Appendix I to the FEIS.  BLM_00008516.

On May 18, 2018, the Notice of Availability for the FEIS was published in the Federal

Register, starting a 45-day FEIS waiting period.  BLM_00008804; BLM_00008819;

BLM_00008843-44.  BLM received nine comments, and reviewed those comments prior to

issuing the ROD.  BLM_00008843.  Plaintiffs submitted their comments on the FEIS on July 9,

2018.  BLM_00004377.  The ROD approving the grant of the seven rights-of-way for the Utility

Project was signed on September 24, 2018.  BLM_00008817.  BLM's decision to approve the

issuance of these rights-of-way was made pursuant to its general right-of-way authority in Title

V of the Federal Land Policy and Management Act.  43 U.S.C. §§ 1761-65.

The DEIS and FEIS both considered a number of options, but BLM selected only two

alternatives for more detailed analysis: the no-action and the preferred action alternative.

BLM_00007746.  In both the DEIS and FEIS, BLM determined that the South Project was an

independent project that would continue to full buildout regardless of whether the Utility Project

was approved.  BLM_00007063; BLM_00007775.  In the DEIS, BLM labeled the South Project

a "non-federal connected action," and listed the South Project's impacts in the indirect impacts

portion of the DEIS in addition to the cumulative analysis.  BLM_00006933, BLM_00007063,

and BLM_00007362.  In the FEIS, BLM removed the term "non-federal connected action" as the

South Project is not a connected action to the Utility Project, and moved the South Project

description to Section 4.4 to clarify that full buildout of the South Project would occur regardless

---

[3] All Plaintiffs in this action joined in one set of collective comments to the DEIS and the FEIS except for Colorado Riverkeeper.  *See* BLM_00002463 and BLM_00004377.  Colorado Riverkeeper did not comment during the NEPA process.

of the Proposed Action or No Action alternatives.  BLM_00007775; BLM_00008117.  In addition the South Project description was expanded to clarify how the South Project utilities would be supplied should the rights of way be denied.  BLM_00008123-7.  Because the South Project's effects are reasonably foreseeable, they were considered in the cumulative impacts analysis for the Utility Project FEIS.  BLM_00007775; BLM_00008052.  BLM also included as additional context description of all known potential effects from the development of the South Project under the No Action Alterative in Section 4.4.3 of the FEIS.  BLM_00007961.

The Service and the U.S. Environmental Protection Agency ("EPA"), the State of Utah, and Uintah County, all participated as cooperating agencies in preparation of the EIS.  BLM_00007771.  Two Agency Interdisciplinary Team meetings were held prior to the issuance of the DEIS.  BLM_00007395, and an additional meeting was held between issuance of the FEIS and ROD.  BLM_00007766.  The EPA rated the DEIS a "3" and "identified the project as a potential candidate for referral to the Council on Environmental Quality (CEQ)."  BLM_00004348.  EPA was concerned with the list of options under the No Action Alternative and what EPA viewed as insufficient information regarding the South Project's impacts.  BLM_10000047-48.  After reviewing the FEIS that narrowed the No Action Alternative and included additional information regarding the South Project, EPA no longer considered the Utility Project a candidate for referral to CEQ.  BLM_00004369.

To comply with Section 7 of the ESA, BLM prepared a biological assessment on the potential effects of its proposed Utility Project on the four endangered Colorado River fish at issue here, among other listed species, and requested formal consultation with the Service.  BLM_00009175.  In July 2018, the Service completed the Section 7 consultation by issuing a BiOp which found that, due to the requirement to comply with the Upper Colorado River

Endangered Fish Recovery Program (which is part of the proposed action here), BLM's proposed Utility Project is not likely to jeopardize the continued existence of endangered Colorado River fish nor destroy or adversely modify any designated critical habitat.[4] FWS_000299; FWS_000303.  Subsequently, in September 2019, after receiving Plaintiffs' second "60-day notice of intent to sue" letter, the Service revisited its decision and amended its BiOp to include discussion on why the potential cumulative effects from the South Project did not change its overall conclusion on the Utility Project.  FWS_001498-1500.  Even with the possible cumulative effects from the South Project, which will eventually require further ESA review and Section 9 "take" authorization, the Service maintained its determination that BLM's proposed Utility Project was not likely jeopardize the continued existence of endangered Colorado River fish nor destroy or adversely modify any designated critical habitat. FWS_00498-1500.

## STANDARD OF REVIEW

Under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, the Court must decide whether the agency actions challenged by Plaintiffs were arbitrary and capricious. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004); *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704–05 (10th Cir. 2009).

---

[4] The Service designated critical habitat for the four endangered Colorado River Fish species in 1994.  59 Fed. Reg. 13,374.  Critical habitat for these fish includes tributaries of the Colorado River.  Within the Upper Colorado River Basin, where the action area is located, critical habitat includes the 100-year floodplain of the Green and White Rivers.  FWS_001488.  The action area includes critical habitat for at least one of the four Colorado River fish in the White River where the Utility Project right-of-way crosses the 100-year floodplain and also includes the Green River 100-year floodplain starting 0.5 miles above the Utility Project's point of diversion and extending downstream to Lake Powell.  *Id.*

In conducting its review, the Court "must determine whether the [agency]: (1) acted within the scope of [its] authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (alterations in original) (citation omitted).

> Agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (internal quotation marks and citations omitted).  A court applying this standard of review must "accord agency action a presumption of validity, and the burden is on the petitioner to demonstrate that the action is arbitrary and capricious."  *Id.*  (internal quotations and citation omitted).

"Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).  Deficiencies in a NEPA document "that are mere 'flyspecks' and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal." *New Mexico ex rel. Richardson*, 565 F.3d at 704.  The Court's role is to ensure that BLM reached a rational conclusion, and "not to substitute [its] judgment for that of the agency." *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citation omitted).

## ARGUMENT

BLM satisfied NEPA's requirements when authorizing the Utility Project.  BLM determined on the basis of its independent review of information it requested and received from Enefit that the South Project would be built with or without the Utility Project.  The FEIS's

inclusion of that determination as the basis for its no action alternative, and underlying the indirect and cumulative effects analysis, was proper.  The Service's BiOp also comports with the ESA and properly analyzed the South Project as an independent action.

**I.    BLM's determination regarding the South Project's buildout was not arbitrary and capricious.**

The majority of Plaintiffs' claims depend on their argument that BLM arbitrarily assumed that the South Project would proceed to full buildout with or without the approval of the Utility Project.  However, the record belies this argument.  As the record reflects, BLM consistently questioned the dependency of the South Project on the Utility Project throughout the NEPA process.  After receiving additional information and answers to their questions from Enefit, BLM reasonably determined that the South Project would proceed even if the Utility Project was not approved.  That determination formed the basis of the no-action alternative that satisfied the requirements of NEPA.

**A.   The Record supports BLM's assumption that the South Project would occur without the Utility Project.**

Plaintiffs attempt to establish doubt regarding whether Enefit would continue with the South Project absent the Utility Project by citing to statements made by Enefit early in the application process suggesting otherwise.  *See, e.g.*, Pls.' Opening Br. 24 n.126 (citing statements contained within Enefit's 2014 plan of development), 26 n.141, 28 n.150, 29 nn.158, 160 (citing Enefit's position in 2015), 27 nn.147-49 (citing a July 2015 email exchange between BLM and Enefit), ECF No. 81 ("Br.").  But the record contains significant evidence showing that both Enefit and BLM changed their viewpoints on the necessity of the Utility Project to the South Project's viability.

In 2013, before Enefit had even applied for the rights-of-way, BLM stated "it is not yet clear . . . whether denial of the Enefit Rights-of-Way applications can wholly prevent the South

Project or not, but we are currently proceeding under the assumption it can." BLM_00001119. In July 2014, BLM admitted that until a July 2014 meeting with Enefit, BLM had assumed that without the rights-of-way, the South Project would be infeasible, but Enefit at that time had already started exploring alternative means to provide each of the required resources. BLM_10009268. In November of 2014, Enefit told BLM that while some engineering and design aspects of the South Project would be influenced by BLM's decision on the rights-of-way, Enefit "currently is proceeding with, and is planning to continue with, South Project development activities and engineering" and "it is incorrect to categorically assume that South Project design and engineering are wholly delayed pending a BLM decision on the Utility Project." BLM_00001510. By the time of the DEIS, BLM determined that there was enough information to make the assumption for the No Action Alternative that "the South Project would go forward should the rights-of-way not be approved." BLM_00006966. The EPA challenged that assumption in the DEIS. BLM_00004353. BLM then followed up with Enefit regarding the alternatives it would pursue in lieu of the Utility Project. BLM_00008535. Based on this further developed record, BLM explained in the FEIS: "It is expected that the South Project will continue to full buildout regardless of the BLM's decision on the Utility Project." BLM_00007775.

The viability of alternatives to the rights-of-way was explored in depth in the FEIS. BLM_00008052; BLM_00008123-27. EPA considered the FEIS's no action alternative a "true No Action alternative" and did not refer the FEIS to CEQ. BLM_00004369. The record, viewed as a whole, thus provides ample support for the FEIS's assumption that Enefit would continue with the South Project absent the Utility Project and contradicts the earlier, isolated statements relied on by Plaintiffs.

Plaintiffs specifically take aim at alternative options for three of the rights-of-way (the transport pipeline, the water pipeline, and the natural gas pipeline).  The feasibility of those same alternatives was the topic of continuing discussions and copious information exchange between Enefit and BLM, and the alternatives are addressed below.

### 1.   The Record shows alternative methods of transportation would suffice for Enefit's purposes if the Utility Project was denied.

Plaintiffs raise concerns regarding the technical and economic feasibility of trucking oil from the South Project should the Utility Project, and specifically the oil product pipeline right-of-way, not be approved.  But these concerns are not new; BLM sought additional information regarding the transportation of oil under the no action alternative several times, for example in July 2014 (BLM_00000015), February 2015 (BLM_00001535), and October 2016 (BLM_00001759).  Plaintiffs cherry pick statements made in the early stages of NEPA review, including the application for the rights-of-way (BLM_00000016 cited at Br. 25 n.132) and a March 2015 response from Enefit to BLM's requests for additional information (BLM_0001542 cited at Br. 24 n.129, 25 n.131, 26 n.141), in their attempt to establish Enefit did not believe it could transport oil without the BLM rights-of-way for an oil pipeline and Dragon Road improvements.  All of this information pre-dates the DEIS.  But later documentation provided by Enefit and Uintah County show the viability of alternative transportation methods for the finished South Project even without BLM approval for the pipeline and Dragon Road rights-of-way.

Enefit identified Dragon Road as a feasible option for the transport of oil, given its current use by oil tankers[5] in its existing condition, ability for use year round, and prior paved

---

[5] Plaintiffs claim that the number of trucks calculated in the FEIS is incorrect.  Br. 24 n.129.  However, Dragon Road in its unaltered state can accommodate double-haul trucks and Enefit confirmed the number of trucks necessary to BLM in 2017.  BLM_00001768; BLM_00001777.

sections.  BLM_00001769.  Enefit admitted that Dragon Road "could handle the increased traffic volumes in its existing condition, albeit with increase maintenance demand on Uintah County." BLM_00001778.  Uintah County commented on the draft EIS and indicated that under the no-action alternative, they did have concerns regarding the use of Dragon Road for transporting product.  BLM_00004290; BLM_00008571.  But, after Enefit and Uintah County discussed the issue further, Uintah County "indicated their willingness to provide increased maintenance for Dragon Road under agreement with [Enefit], should this become necessary under the No Action alternative."  BLM_00001778; *see also* BLM_00008127.  BLM reviewed that draft agreement between Uintah County and Enefit, *see*, BLM_00001780-85, as part of their analysis. BLM_00008127.

Enefit also provided BLM with comparators to show why they believed Dragon Road was viable.  In addition to the general use of trucking of oil throughout the Uinta Basin, BLM_00001770, Enefit compared the estimated number of trucks that would be needed to transport product daily to another proposed project in Uintah County (where a 40,0000 barrel-per-day facility would have approximately 250 trucks hauling crude oil in and 250 trucks hauling product out per day).  BLM_00001778.  While Plaintiffs may remain skeptical regarding the prudence or economic viability of around the clock trucks traveling to and from the South Project, clearly other companies in the region have found trucking oil economically viable. Those comparisons combined with information specific to Enefit throughout the Record support the assertion that the crude oil product could be moved from the South Project without the rights-of-way.

**2. The Record shows an alternative water supply could support the South Project if the Utility Project was not approved.**

Again, Plaintiffs rely on outdated or misinterpreted statements by Enefit to raise doubt regarding Enefit's ability to supply the South Project with sufficient water absent the water pipeline right-of-way.  Br. 27-30.  For example, Plaintiffs rely on a 2015 statement by Enefit that there were "insufficient lands" for "the necessary water withdrawal infrastructure" available at the White River.  Br. 27.  In 2015, Enefit admitted there was not enough room specifically at the utility crossing site to install water collection facilities.[6]  BLM_00000040-41.  But, Enefit does not propose to withdraw water from that location of the White River if this right-of-way is not granted.  Similarly, Plaintiffs attack the feasibility of purchasing and trucking water to support the South Project (Br. 29), but in later-dated documents, Enefit abandoned that as an alternative to the water pipeline.  *See, e.g.*, BLM_00001768; BLM_00001776.  Instead, the record shows Enefit would have sufficient water available for the South Project without approval of the Utility Project, without the option they rejected in 2015, and without trucking that water.

If BLM were to deny the rights-of-way, Enefit's proposal was to convert one or more of their existing 16 water monitoring wells, located on their private property, into water supply wells.  BLM_00001765-66.  This alternative would require submitting an application to the Utah State Engineer to change the point of diversion of Water Right #49-258 to one or more of Enefit's monitoring wells.  BLM_00001776-77.  Water Right #49-258 is not owned by Enefit but Enefit has an agreement in place to source water from the owner of that right (Desert Generation and Transmission Cooperative).  BLM_00007798.  While the process of applying to change the point of diversion for that water right may take time as Plaintiffs suggest, there is

---

[6] This scenario proposed by BLM to Enefit was included in the FEIS as an alternative considered but dismissed.  BLM_00007837.

nothing in the Record to suggest that it could not be done, and Enefit indicated that it would pursue this option. BLM_00001776. And, while the application to change the point of diversion is in process, Enefit could use its own Water Right #49-1639 to immediately supply water for the early phases of the South Project. BLM_00001768; BLM_00001776-77; BLM_00008124.

Statements from the DEIS reflecting doubt on the part of BLM are not present in the FEIS, indicating that after BLM's review of additional materials they were assured of the feasibility of Enefit's ability to supply the South Project with water absent the grant of the Utility Project's rights-of-way. BLM_00008124-25.

### 3. The Record shows Enefit had alternative means of obtaining the necessary natural gas supply for the South Project without the natural gas pipeline right-of-way.

Plaintiffs cite outdated assessments by Enefit of potential alternative options in their attempt to prove that the South Project could not function without the natural gas pipeline right-of-way. Br. 30-32. Enefit's earlier statements regarding the economics of other options notwithstanding, they were still considering and pursuing at least one of those options at the time of the FEIS. In 2017, Enefit had communicated with Summit Midstream Partners ("Summit") regarding use of Summit's existing natural gas pipeline should the rights-of-way not be granted by BLM. BLM_00001774-75. While the Summit pipeline currently does have a lower flow rate than Enefit would need to fully supply the South Project, it is the same size (6 inches, (BLM_00001774)) as compared to the Utility Project's minimum proposed diameter (6-12 inch) for the natural gas pipeline (BLM_00007801)). The Record also contains evidence that the South Project could potentially provide its own hydrogen for hydrotreating via the retorting technology at the plant, and heating could be provided if not through the natural gas pipeline then through waste heat recovery. BLM_00001767. Just because in 2015 Enefit considered these options to be more expensive than the natural gas pipeline right-of-way does not mean that

they were not viable.  The existence of these alternatives and Enefit's willingness to explore and use them supports Enefit's statement and BLM's determination that the natural gas right-of-way was not "wholly necessary" for development of the South Project.  BLM_00001774.

### B. BLM repeatedly challenged Enefit's assertions regarding the South Project's dependence on the Utility Project.

Plaintiffs insinuate BLM did nothing to independently assess Enefit's assertion that it would proceed with the South Project absent the Utility Project's approval.  They are wrong. Throughout its NEPA review, BLM repeatedly challenged Enefit's assertions and requested follow up information from Enefit for review and analysis.

Prior to Enefit's submission of its rights-of-way application, BLM expressed uncertainty regarding whether denial of the rights-of-way could prevent the South Project's construction, "but we are currently proceeding under the assumption that it can."  BLM_00001119.  That is, BLM had to be convinced from the outset that the South Project was not reliant on the Utility Project.  BLM carried that assumption until July 2014, when Enefit indicated otherwise on a conference call.  BLM_00001342.  At that point, BLM immediately asked for clarification regarding how the denial of the rights-of-way would affect the South Project.  BLM_00001343. BLM repeatedly sought (and received) answers from Enefit in response to "data gaps" identified by BLM including a number of requests for information specific to the viability of the alternatives to the Utility Project.  BLM_00001375 (October 2014 data gap responses); BLM_00001560 (February 2015 data gap requests); BLM_00001536 (responses to February 2015 requests).  In addition to formal requests for information specific to the alternatives available to Enefit, BLM informally emailed numerous questions and requests for follow up information regarding the South Project.  *See, e.g.*, BLM_00001639; BLM_00001641; BLM_00001620, BLM_00001616.  After the EPA's comments on the DEIS, BLM sought a

better understanding for "the basis for Enefit's position that development of the South Project will proceed regardless of whether BLM approves the ROWS for the Utility Corridor Project." BLM_00001759. BLM requested specific responses and documentation, including maps, feasibility studies, and other analyses. *Id.* Enefit provided two detailed letters in response laying out its analysis of alternatives. BLM_00001762-73; BLM_00001774-78.

This back and forth between Enefit and BLM does not reflect that the agency "merely accepted Enefit's unsupported 'self-serving statements or assumptions' that it could secure alternative utilities to allow full buildout of the South Project." Br. 21. Instead, the ongoing discussions and information exchange between BLM and Enefit show that the agency was independently weighing and questioning Enefit's assertions for years. BLM reviewed information underlying Enefit's assertions and determined the information supported those assumptions. "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011) (internal quotation omitted). This is not arbitrary and capricious, but instead how NEPA should work.

Plaintiffs attempt to draw parallels between this case and *Hammond v. Norton*. 370 F. Supp. 2d 226 (D.D.C. 2005) (cited at Br. 20). But the cases are distinguishable. At issue in *Hammond* was the relationship between two segments of one pipeline that had previously been the target for a joint venture that was dissolved only when the proponents of the two segments learned BLM intended to consider them as connected actions for purposes of NEPA.[7]  Here, the

---

[7] Additionally, in *Hammond*, the court spent much time describing the applicant's pipeline and another pipeline as connected actions. However, as BLM regulations and the Instruction Memorandum cited in Plaintiffs' brief make clear, there is no such thing as a non-federal connected action. Bureau of Land Mgmt., Analysis of Connected Actions Under NEPA, BLM Permanent Instruction Memorandum No. 2018-023 (Sept. 10, 2018),

South Project is a standalone project on private property.  BLM_00007721.  While the Utility

Project will serve to support the South Project, it is not the same relationship as between two

pipeline rights-of-way, both of which would cross federal lands and require agency approval, as

was the case in *Hammond*.  370 F. Supp. 2d at 232.  More importantly, unlike the statements by

the rights-of-way applicant BLM relied on in *Hammond*, Enefit's statements regarding their

plans for the South Project in the absence of the Utility Project did not go unsubstantiated.  As

described above, the opposite is true.

Other cases cited by Plaintiffs show that courts found agencies' decisions unreasonable

when the decisions' administrative records included information that made information provided

by applicant suspect in some way, *see*, *e.g.*, *Am. Rivers v. Fed. Energy Reg. Comm'n*, 895 F.3d

32, 50-51 (D.C. Cir. 2018) (the information provided by Applicant was based on a decade old

survey from other regions, and accepted by the agency "without any interrogation or

verification"), or that the agencies failed to do *any* analysis of applicants' statements, *see, e.g.*,

*Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 668-69 (7th Cir. 1997) (the Record

contained "*no hint* that the Corps gave independent thought to the feasibility of alternatives" and

the agency never explained the basis of its assumptions) (emphasis added).  Neither is true here.

Instead, as described above, BLM approached Enefit's assertions with "a degree of skepticism"

and sought additional information from Enefit to review and analyze Enefit's position.  *Envt'l*

*Law & Policy Ctr. v. U.S. Nuclear Reg. Comm'n*, 470 F.3d 676, 683 (7th Cir. 2006) (internal

---

https://www.blm.gov/policy/pim-2018-023, last visited Aug. 5, 2020.  The South Project cannot
qualify as a connected action and is distinguishable from the pipeline challenged in the
*Hammond* case on that ground as well.  Much of Plaintiffs' comments on the DEIS and FEIS
focused on their argument that the Utility and South Project were connected actions, *see*
BLM_00002483-84 and BLM_00004381-86, but they do not raise that argument in their briefing
here.

quotation omitted).  Enefit provided answers for BLM's questions and only after the review of that additional information was BLM able to assume for purposes of the FEIS that the South Project would be carried out without the Utility Project.

NEPA requires agencies to evaluate the environmental impacts of various projects, and federal regulations require that agencies verify environmental information provided by applicants.  40 C.F.R. § 1506.5(a).  To that end, BLM did not blindly rubberstamp every statement made by Enefit, as shown by their repeated challenges to Enefits' assertions and requests for follow up information, and evaluation of that information.

### C.  BLM's no action alternative complied with NEPA.

Plaintiffs claim that the no action alternative considered by BLM was not a "true" no-action alternative because it still assumed full buildout of the South Project.  Br. 17.  As described above, it was reasonable for BLM to assume for purposes of the FEIS that Enefit would continue with full buildout of the South Project with or without the rights-of-way, *supra*, Section I.A, and that assumption does not render the no-action alternative arbitrary and capricious.

An agency must consider the alternative of taking no action with regard to the proposed project.  40 C.F.R. § 1502.14(d).  But no action by the agency does not necessarily mean no development.  A truly flat no action alternative, or a "do nothing" alternative may not be a reasonable alternative.  *See, Nashvillians Against I-440 v. Lewis*, 524 F.Supp. 962, 988 (M.D. Tenn. 1981) (holding that even the inclusion of certain necessary road improvements in a "no build" alternative for a proposed highway was reasonable).

> [W]here a choice of 'no action' by the agency would result in predictable actions by others, this consequence of the 'no action' alternative should be included in the analysis.  For example, if denial of permission to build a railroad to a facility would lead to

> construction of a road and increased truck traffic, the EIS should
> analyze this consequence of the 'no action' alternative.

*Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 171 (D.D.C. 2014) (quoting

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act

Regulations, 46 Fed. Reg. 18,026-01, 18,027 (March 23, 1981)).  Other courts have found

agencies' no action alternatives reasonable where they included the assumption of future action

by non-federal agencies.  *See, e.g.*, *Cmtys., Inc. v. Busey*, 956 F.2d 619, 626 (6th Cir. 1992);

*Young v. Gen. Serv. Admin.*, 99 F. Supp. 2d 59, 74 (D.D.C. 2000) ("[W]here, as here, a decision

by the government not to consolidate its facilities on undeveloped land would result in

significant private commercial and residential development on the vacant property, the

consequences of that alternative development should be addressed.  The 'No Action' alternative

does nothing more than that."), *aff'd*, 11 F. App'x 3 (D.C. Cir. 2000).

The FEIS's no action alternative's inclusion of the predictable actions of Enefit—the full

buildout of the South Project—did not undermine BLM's analysis.  This no action alternative

provided an appropriate benchmark in the form of a continuation of the status quo—Enefit

working towards building its South Project regardless of the existence and approval of the Utility

Project rights-of-way.

## II.   BLM appropriately analyzed the indirect effects of the Utility Project under NEPA.

The FEIS contains a thorough discussion of the potential impacts of the Utility Project.

First, Plaintiffs claim the indirect effects analysis is "poisoned" because it relies on what

Plaintiffs describe as the arbitrary and capricious assumption that the South Project would

continue "undiminished in scale" absent the Utility Project.  Br. 33.  This argument falls

alongside Plaintiffs' other challenges to assumptions underlying the FEIS's reasonable no action

alternative.  *See, supra*, Section I.  Second, Plaintiffs claim even if that assumption was correct,

the indirect effects analysis in the FEIS is unlawful.  Br. 34-36.  They are wrong.  BLM included

the precise indirect effects analysis Plaintiffs seek, albeit not in a section labelled "indirect

effects," in full compliance with NEPA.

### A.  BLM properly analyzed the difference in effects of the South Project with and without the Utility Project's Approval.

BLM's instruction memorandum, as cited by Plaintiffs, explains that if a "non-Federal

action or its effects can be prevented or modified by BLM decision-making, then the effects of

the non-Federal action are properly considered indirect effects of the BLM action . . .".  Br. 35

(citing BLM Permanent Instruction Memorandum No. 2018-023).  Plaintiffs appear to interpret

NEPA to require that all of the South Project's impacts be considered as indirect effects.  But to

consider *all* of the South Projects effects as indirect effects would contradict the definition for

indirect effects in the NEPA regulations: "Indirect effects . . . *are caused by the action* and are

later in time or farther removed in distance but are still reasonably foreseeable."  40 C.F.R. §

1508.8(b) (emphasis added).  Instead, the Instruction Memorandum and NEPA regulations

require that BLM consider as indirect effects only those effects of a non-Federal action that can

be modified by BLM's decision.  Here, only the effects resulting from the difference in how the

South Project would be developed with the grant of the rights-of-way as compared to the no

action alternative are properly considered indirect effects of the Utility Project.  And, Plaintiffs

appear to agree, approving of Enefit's description of what the FEIS should include as indirect

effects (i.e. the extent to which the South Project and its effects can be prevented or modified by

the BLM decision-making on the Utility Project are the portions of the South Project that need to

be included as indirect effects.)  Br. 35 (citing BLM_00001820).

The FEIS considered those indirect effects resulting from the difference in how the South

Project would proceed with the Utility Project as opposed to the no-action alternative.  Because

all of the South Project's effects were considered within the cumulative impacts portion of the FEIS to avoid confusion (BLM_00007775), the indirect effects resulting from the portions of the South Project impacted by the Utility Project are identified in the cumulative impacts analysis. For instance, BLM properly identified components of the South Project that would be modified by the issuance of the ROWs to include emissions and water resources.  BLM discussed qualitatively the emissions from the proposed action being lower than the no action alternative absent the trucking necessary for the non-Utility Project alternatives.  BLM_00008057, BLM_00008065.  (Similar comparisons were made for soils (BLM_00008067), minerals (BLM_00008068), and vegetation (BLM_00008079)).  Section 4.3.3.5.3 contains the indirect effects analysis of the construction and operation of the South Project on water resources with the Utility project.  BLM_00008069-72.  This includes the withdrawal of water and how it may affect the Green River's flow given the mining operations' needs and the impact on the water quality from discharge from the oil shale development.  *Id.*  BLM also included in the FEIS an additional context description of all known potential effects from the development of the South Project under the No Action in Section 4.4.3 of the FEIS (BLM_00008127-57) which further identifies indirect effects.  For example, the summary results in that section compare qualitatively the proposed action and no action effects on greenhouse gases (BLM_00008133), air quality (BLM_00008135), and soils (BLM_00008136).

**B. Any failure to label the indirect effects analysis as such does not invalidate the FEIS or ROD.**

In the DEIS, the indirect effects of the South Project resulting from the Utility Project—along with all of the potential impacts from the South Project, including those that were not indirect effects—were included in the indirect effects section, listed by resource.  *See, e.g.*, BLM_00007248, BLM_00007253 (greenhouse gas effects); BLM_00007258-59 (air emissions);

22

BLM_00007270, BLM_00007276 (water resources).  Because of the confusion caused by the DEIS regarding the relationship between the South Project and the Utility Project, all of the South Project's effects, including those incremental effects resulting from use of the Utility Project, were moved to the cumulative effects portion of the FEIS.  The location of the analysis does not invalidate the FEIS's indirect effects analysis.

NEPA dictates that the agency must consider the environmental impacts of major federal actions and provides direction on the scope of that analysis.  42 U.S.C. §§ 4321, 4332; 40 C.F.R. §§ 1500.1-1500.6.  "[W]e must examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making."  *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1177 (10th Cir. 1999).  BLM considered the indirect effects as described above.  They were presented to the public in the DEIS as indirect effects, and regardless of their location in the FEIS, informed BLM's decisionmaking.  Where the indirect effects are located within the agency's EIS is not dispositive where, as here, the FEIS satisfies NEPA's requirements by ensuring the agency "carefully [considered] detailed information concerning significant environmental impacts" and provided the public with "relevant information."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

III.    **BLM took a hard look at the South Project's impacts.**

Plaintiffs allege that because the FEIS provides a "limited" analysis of the South Project's effects, it fails "to satisfy NEPA's hard-look mandate."  Br. 36.  While the cumulative effects discussion of the South Project's effects is *more* limited than that of the Utility Project (*see* Br. 36 (citing BLM_00007743)), it is sufficient for purposes of NEPA.

The FEIS's cumulative impacts analysis spans more than 70 pages and shows BLM gave careful consideration to the cumulative impacts of the South Project.  BLM_00008045-8117.

Moreover, the FEIS also includes an additional section of information discussing the potential impacts from developing the South Project without the requested rights-of-ways, even though BLM has no jurisdiction over this privately-owned proposed development. BLM_00008117-8157.

### A. BLM took a hard look at the South Project's water-quality impacts.

The FEIS contains a thorough discussion of the South Project's water quality impacts. The "South Project is called out in detail in [the] cumulative analysis because it would be serviced by the Utility Project and because certain effects from the South Project may accumulate with the effects of the Utility Project." BLM_00008052. For the FEIS's analysis of water resources, BLM examined cumulative impacts for a five year scope for construction and stabilization of the Utility Project, and assumed the utilities would continue for the life of the South Project (30 years or longer for the 12-digit Hydrologic Unit Code (HUC) (watershed) drainage areas crossed by the Utility Project and the South Project). BLM_00008048.

Issues identified in the FEIS relating to water quality included potential for impacts on water resources "that are valuable or susceptible to surface-disturbing activities such as riparian areas along the White River and Evacuation Creek" and impacts on "areas with high potential for discharging erosion related sediment into water resources." BLM_00008068. The FEIS contains a detailed list of potential effects of the construction and operation of the South Project on water resources. BLM_00008069-70. Then, several of these issues are discussed more in-depth including the impacts of construction and operation of the mine on surface runoff, erosion of streambeds, the increase of salt loading of streams near roads, and the degradation of surface water quality. BLM_00008072-73. The FEIS also describes the impacts of the South Project on groundwater, and discusses the potential for the spent shale being a source of contamination and leachates containing contaminants entering nearby surface water bodies or groundwater, if not

properly managed. BLM_00008074. This section of the FEIS also contains a discussion of the effect of the increased permeability of the geologic material in the mine on groundwater and the potential for leachate. *Id.* BLM reasonably determined that the magnitude of all of these impacts depended "on the detailed mine [plan of development]," which did not exist and would be considered by a different agency in the future. BLM_00008075.

Plaintiffs take issue with BLM's explanation for why the South Project's impacts on water quality were not quantified. They identify a sequencing map present in the Record (but not the FEIS) and postulate that this map combined with documentation of types of waste from oil-shale mining and processing could have been used to quantify how the South Project would affect these various water resource issues. Br. 37-38. But the sequencing map does not quantify any acreages as it merely color codes potential development by year, and additionally is labeled "preliminary", dated 2012, and incorrectly projects a 2019 mining start date. BLM_00006030. It is not clear why Plaintiffs believe such a map would assist in accurate quantification of any effects. Similarly, the map combined with three sources about oil shale production generally, i.e. not specific to Enefit's South Project, hardly constitute a "wealth of 'non-speculative' information." Br. 38.

Plaintiffs' disagreement with BLM's assessment—that impacts from the South Project on water quality are not quantifiable—does not undermine BLM's expert conclusion. "[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1057 (10th Cir. 2011) (quoting *Marsh*, 490 U.S. at 378); *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1271 n.14 (10th Cir. 2004) ("[An agency] is entitled to rely on its own experts even when

their opinions conflict with those of other federal agencies, as long as its decisions are not arbitrary and capricious.").  BLM's explanation for why water quality impacts from the South Project could not be quantified is owed deference.  That explanation along with the qualitative discussion of the water quality impacts satisfies NEPA's hard look requirement.

**B.  BLM took a hard look at the South Project's air emissions and greenhouse gas emissions effects.**

The FEIS took the requisite hard look at the South Project's greenhouse gas emissions and air quality effects in the cumulative impacts analysis.  The temporal scope of the cumulative impact analysis for these two resource issues was five years for construction and stabilization of the Utility Project, plus an additional 30 years or longer through the life of the Utility Project.  BLM_00008047.  The geographic scope was the entire Uinta Basin plus nearby Class I and Sensitive Class II areas.  BLM_00008047.

The FEIS includes a detailed qualitative discussion regarding greenhouse gas (or "GHG") emissions resulting from the South Project.  This information does not "play down" (Br. 39) the South Project's emissions, but instead discusses the South Project's contributions "in the context of other precursor emissions in the region."  BLM_00008065.  The FEIS discloses the South Project would have "substantial GHG emissions that may be higher than the 25,000 metric tons $CO_2eq$ per year threshold for annual reporting under the Mandatory Greenhouse Gas Reporting rule."  BLM_00008058.  Section 4.3.3.1.3.1 discloses the many anticipated sources of the South Project's greenhouse gas emissions including surface mining, shale crushing and retorts, shale gas and hydrogen plants, raw shale oil upgrading, shale oil storage tanks, and on-site power generation.  BLM_00008058-60.  The FEIS also includes a section providing additional South Project information (Section 4.4), BLM_00008117-8160, which has a subsection on emissions (4.4.2.3), BLM_00008121-22, and an assessment of greenhouse gas emissions absent the Utility

Project , BLM_00008127-30.  Section 4.4 also includes a discussion on the potential for permits being required due to quantity of emissions from the South Project, and also potential for qualification of the South Project as a minor emission source.  *Id.*

The FEIS also includes qualitative discussion of the air emissions resulting from reasonably foreseeable activities, including the South Project.  BLM_00008061-65.  This includes a description of all the sources of air emissions (Section 4.3.3.2.3.1, BLM_00008062-63), a discussion of the localized nature of the effects of fugitive dust and combustion products and a dispersal of other emissions (BLM_00008063), and a discussion of ground level ozone in the Uinta Basin region and impact of the South Project on ground level ozone (BLM_00008064-65).  The South Project-specific section of the EIS anticipates a future permit process that would include an impacts analysis addressing the dispersion effects of pollutants.  BLM_00008122.

Ultimately, while the FEIS contains thorough qualitative discussions of the GHG emissions and air quality effects resulting from the South Project, BLM reasonably concluded "there is insufficient engineering data for the South Project at this time to quantify the GHG emissions."  BLM_00008058; *see also* BLM_0008065 ("[I]t cannot be predicted with quantitative certainty the extent to which oil shale development activities. . . will contribute to air quality effects).  And, "obtaining the unknown emissions quantifications from the South Project would be cost prohibitive because it would require the Applicant to design and engineer the entire South Project twice—once with the Utility Project and once with utility alternatives."  BLM_00008057.  BLM disclosed it did not have the information necessary to quantify the greenhouse gas emissions (and air quality effects), and then explained that "unknown information" was "not essential to a reasoned choice between alternatives."  BLM_00008057.  This satisfies NEPA's hard look requirement.

Plaintiffs point to what they call a "wealth of relevant, detailed information sufficient to permit a rigorous quantitative estimate of the South Project's emissions. . . ."  Br. 41.  But Plaintiffs overstate the availability and utility of the information on the Record.  They also fail to show that BLM's conclusion that emissions could not be quantified was arbitrary and capricious.

First, Plaintiffs point to comments by the EPA advising BLM that adequate information existed to allow BLM to quantify emissions impacts.  Br. 41.  BLM adequately considered those comments and appropriately engaged with EPA throughout the NEPA process.  *See supra,* Section I.B.  "Although an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees.  Agencies are entitled to rely on the view of their own experts."  *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) (internal citation omitted); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 276 (D.D.C. 2009), *aff'd,* 616 F.3d 497 (D.C. Cir. 2010).  BLM was entitled to rely on their own expertise and conclude they could not quantify the emissions impacts regardless of the EPA's viewpoint.

Second, Plaintiffs point to one academic journal[8] on the Record that estimates greenhouse-gas-emissions factors at Enefit's Estonian oil-shale plant, and a powerpoint presentation describing the carbon intensity of oil at the Estonian operation as part of the "wealth

---

[8] To the extent Plaintiffs claim the FEIS is deficient because of failure to provide that article to the public, the article is cited in the FEIS at the moment it is discussed BLM_00008128, and the full citation is available under the References section (BLM_00008188).  That article was not provided in an appendix but can easily be found via Google. *See* Andres Siirde, Meelis Eldermann, Priit Rohumaa and Julija Gusca, *Analysis of Greenhouse Gas Emissions from Estonian Oil Shale Based Energy Production Processes, Life Cycle Energy Analysis Perspective*, 30 Oil Shale (Special Issue) 2S (2013), https://scholar.google.com/scholar?q=Analysis+of+Greenhouse+Gas+Emissions+from+Estonian +Oil+Shale+Based+Energy+Production+Processes.&hl=en&as_sdt=0&as_vis=1&oi=scholart

of relevant, detailed information" that BLM should have used to quantify emissions from the

South Project.  Br. 41-42.  The FEIS explained Utah oil shale has much lower moisture content,

limiting "direct comparisons of GHG emission intensity" between Estonian and Utah oil shale.

BLM_00008128.  The FEIS described other differences between the facilities and equipment

between the Estonian oil-shale plant and the South Project as well.  Ultimately, the FEIS

supports BLM's determination that it could not quantify emissions impacts, and BLM's expertise

in this regard is owed deference by this Court.  *Morris v. U.S. Nuclear Reg. Comm'n*, 598 F.3d

677, 691 (10th Cir. 2010) (stating that under NEPA "our deference to the agency is especially

strong where the challenged decisions involve technical or scientific matters within the agency's

area of expertise" (internal citations omitted)); *see also High Country Conservation Advoc. v.

U.S. Forest Serv.*, 52 F. Supp.3d 1174, 1194 (D. Colo. 2014) ("[T]he disagreement between

the agencies and plaintiffs about the accuracy of plaintiffs' mathematical forecasting . . . strikes

this Court as precisely the type of technical disagreement where deference to the agency is most

important.").

**IV.    The Service and BLM properly analyzed the effects of the Utility Project on listed
        species in compliance with the ESA.**

Plaintiffs' ESA arguments take issue with the Service's Section 7 cumulative effects

analysis.  Br. 44-52.  More specifically, Plaintiffs assert that the Service failed to analyze, as part

of the direct and indirect effects analysis for the proposed Utility Project, the potential effects to

endangered Colorado River fish species resulting from the South Project – *i.e*., (1) the South

Project's potential water depletion from the Green River (approximately 10,700 acre-feet-year);

and (2) the South Project's potential contamination of the Green River from sedimentation and

leachate.  In the alternative, Plaintiffs also argue that the Service's cumulative effects analysis

was deficient.  As explained in more detail below, the Service appropriately analyzed the

potential effects of the South Project on endangered Colorado River fish as cumulative effects. And the cumulative effects analysis was as thorough and complete as possible given the amount of information available on the South Project at the time of consultation. For these reasons, the Service's Section 7 determination on the proposed Utility Project (the Federal action), including its cumulative effects analysis on the South Project, fully complies with the ESA, is reasonable, and should be upheld.

**A. The Service's decision to consider the South Project's potential mining effects on endangered Colorado River fish as cumulative effects was reasonable.**

BLM requested Section 7 consultation on its proposed action only – the Utility Project. BLM_00009175. As detailed above, BLM appropriately determined that the South Project, with its associated mining impacts such as water depletion and water contamination, was not part of the proposed Utility Project – Enefit would construct the South Project with or without the Utility Project. *See supra* Section I; BLM_00009176. Thus, BLM's proposed Utility Project is not the "but for" cause of the South Project. For this reason, the Service's decision not to consider potential impacts from the South Project as effects of the Utility Project for Section 7 purposes was appropriate. BLM_00009176; FWS_1498-1500. But the Service, to the extent it was able, still considered the South Project's likely adverse mining impacts (*e.g.*, habitat loss, competition from nonnative fish, and degraded water quality) on endangered Colorado River fish as cumulative effects.[9] FWS_001498-1500.

The Service fully acknowledged the likely adverse cumulative impacts from the South Project's anticipated 10,700 afy water depletion from the Green River. FWS_001498. The Service noted that, like the Utility Project's smaller anticipated water depletion, the South

---

[9] "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to [Section 7] consultation." 50 C.F.R. § 402.02 (2018).

Project's approximate 10,700 afy water depletion would also trigger compliance with the Upper Colorado River Endangered Fish Recovery Program and would require a depletion fee and implementation of other compensatory recovery actions necessary to avoid jeopardy of the species or destruction of any designated critical habitat – *e.g.*, securing instream flows, improving fish passage around fish barriers, reducing entrainment from diversions, removing nonnative fishes, and stocking of razorback sucker and bonytail chub to increase populations. FWS_001498-99.  Further, the Service noted that in order to avoid Section 9 liability (avoiding unauthorized "take" of listed species), the South Project, before operations could commence, required further environmental review under the ESA.  FWS_001498.  As part of any additional environmental review under the ESA, the Service determined that the South Project may be required to pay the Recovery Program's depletion fee and work with the Recovery Program to identify additional conservation actions to comply with the program.  FWS_001499.  These required Recovery Program measures have proved successful with other projects with similar significant depletion levels and also have improved the overall status of endangered Colorado River fish species.  FWS_001499.

    The Service also fully acknowledged the South Project's potential adverse effects on endangered Colorado River fish due to increased mining contamination from sediment and leachate resulting in fish displacement from preferred habitats, habitat degradation, etc. FWS_001499.  But the likelihood, intensity, and consequences, of any impacts from mining contamination would depend on a number of unknown factors such as, among other things, conservation measures to reduce sedimentation and leachate effects from the South Project, number and type of oil shale projects built, geographic location of mining activities, and other site and project-specific details.  FWS_001499-1500.  These necessary details were unknown to

the agencies at the time the FEIS and ROD were prepared and, in fact, are still unknown.  *Id.*
For this reason, the Service was not able to further analyze effects from contamination.
FWS_001499.  Regardless, like the impacts from water depletion, any potential South Project
impacts to endangered Colorado River fish from mining contamination, would require further
environmental review under the ESA.  FWS_001500.

In sum, the Service's consideration of the South Project's potential mining impacts on
endangered Colorado River fish as cumulative effects was appropriate.  The South Project is not
part of the proposed Utility Project because the South Project will be constructed with or without
the Utility Project.[10]  *See supra* Section I; BLM_00009176; FWS_1498-1500.  Thus, BLM's
approval of the Utility Project was not the "but for" causation of the South Project.  Regardless,
the Service, to the extent it was able, still considered the South Project's likely adverse mining
impacts on endangered Colorado River fish as cumulative effects.  FWS00_1498-1500.  The
Service found that, because the Upper Colorado River Endangered Fish Recovery Program
effectively served as an appropriate protective and conservation measure for listed species, the
Utility Project was not likely to jeopardize endangered Colorado River fish or adversely modify
any designated critical habitat.  FWS_001500.  That decision was reasonable, supported by the
record, and should be upheld.

**B. Plaintiffs have not demonstrated the Service's "cumulative effects" analysis or
decision to be unreasonable.**

Dissatisfied with this result, Plaintiffs take issue with the Service's analysis of the South
Project's potential mining effects as cumulative effects.  As detailed below, none of Plaintiffs'
argument have any merit.

---

[10] For these reasons, Enefit did not, at the time of Section 7 consultation on the Utility Project,
require "take" authorization for the South Project.

1.  **The Service properly considered the South Project's potential effects as cumulative effects.**

Plaintiffs primarily argue that the Service was required to analyze the potential effects of the South Project on endangered Colorado River fish as a direct or indirect effect of the proposed Utility Project – not as a cumulative effect.  Br. 45-49.  Plaintiffs' argument is misplaced.

Direct effects are undefined in the ESA's implementing regulations, but are commonly understood to be the immediate effects on a listed species or on critical habitat that will result from the *proposed action*.  *See* ESA Consultation Handbook at 4-26 (defining "Direct Effects" as "the direct or immediate effects of the project on the species or its habitat . . . [resulting] from the agency action including the effects of interrelated actions and interdependent actions . . . .").[11] Second, indirect effects are "those that are caused by the *proposed action* and are later in time, but are still reasonably certain to occur."  50 C.F.R. § 402.02 (2018) (emphasis added).  Indirect effects may involve subsequent actions by other parties but must ultimately be caused by the *proposed action*.  And finally, "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to [Section 7] consultation."  50 C.F.R. § 402.02 (2018).

The Ninth Circuit's *Sierra Club v. BLM* ("*Sierra Club*"), 786 F.3d 1219 (9th Cir. 2015), is instructive on the applicability of and interplay among ESA direct, indirect, and cumulative effects.  In *Sierra Club*, BLM granted a right-of-way over federal land for a road that would connect the North Sky wind energy project, located on private land, to a nearby state highway. *Id*. at 1222-23.  As part of its application, North Sky also identified a second viable route of access—a route through private land only—that served as an alternative link from the wind

---

[11] The ESA Consultation Handbook can be found at https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

project to the state highway.  *Id*. at 1222.  Before issuing a right-of-way for the road, BLM

consulted with the Service under the ESA.  *Id*.  BLM concluded that North Sky's private road

option served as a viable alternative route, and noted that because of this, North Sky was likely

to move forward with the Wind Project regardless of whether BLM approved the right-of-way

over federal land.  *Id*.  Thus, BLM limited both its consultation with the Service to the road and

did not, as the plaintiffs requested, treat the private wind project as part of the Federal road right-

of-way it was approving.  *Id*. at 1223.

   In its review, the *Sierra Club* court held that the private wind project was not connected

to the Federal road right-of-way and that therefore, BLM was not required to consult with the

Service at that time for the wind project.  *Id*. at 1224-25.  The court held that the wind project

was not a "direct effect" of the road right-of-way, as the wind project was not directly funded,

authorized, or carried out by BLM, nor was there any element of discretionary federal

involvement or control.  *Id*. at 1224-26.  With respect to "indirect effects," the *Sierra Club* court

reasoned that it could not be "fairly said that the Road Project caused the Wind Project or

brought it into existence."  *Id*.  Quite the contrary, because North Sky had presented a viable

alternative route through private land, the Ninth Circuit found that the wind project likely would

have been completed regardless of whether BLM approved the road.  *Id*.  at 1225.  In other

words, because North Sky was prepared to use the private road option to complete its wind

project if necessary, BLM's approval of the road could not have been the "but for" cause of the

wind project.  *Id*.  Therefore, the private wind project was not sufficiently connected to the

Federal road right-of-way that required BLM and the Service to consider the wind project as

direct or indirect effects of BLM's proposed action – the Federal road right-of-way.  *Id*.

Here, in the case at hand, the Service can only consult on the proposed action provided by BLM; it cannot, as Plaintiffs urge, arbitrarily change the proposed action to something different. As detailed above, BLM appropriately did not include the South Project's anticipated mining impacts as direct or indirect effects of the proposed Utility Project because it was not the "but for" cause of the South Project – the South Project would be constructed with or without BLM's proposed Utility Project.  *See supra* Section I; BLM_00009176; FWS_001498-1500; *Sierra Club*, 786 F.3d at 1224-25.  For this reason, BLM appropriately considered the South Project's potential mining activities as ESA cumulative effects – *i.e.*, "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  FWS00_1498-1500; 50 C.F.R. § 402.02 (2018).

And for this same reason, the Service also appropriately considered the South Project's potential mining impacts as ESA cumulative effects.  FWS_00198-1500.  The Service assessed the South Project's water depletion effects, determined that Enefit would be required to comply with the Upper Colorado River Endangered Fish Recovery Program, and noted that, based on past experience with projects resulting in similar size water depletions, compliance with the Recovery Program proved effective in minimizing impacts and improving the overall status of endangered Colorado River fish.  FWS_001498-99.  The Service also noted it could not cover associated "take" under Section 9 due to water-depletion cumulative effects and, as a result, the South Project would have to comply with Section 9 by undergoing its own analysis under the ESA.  FWS_001498-99.

With respect to the South Project's potential adverse effect of increased contamination, the Service noted that it did not have sufficient information to meaningfully analyze these

potential effects.  FWS_001499.  But similar to the water depletion issue, the South Project, in order to comply with Section 9's prohibition on "take," would need to undergo its own analysis under the ESA.  FWS_001499-1500.  As part of that future required analysis with more precise information, the Service will be able to more meaningfully analyze the South Project's direct and indirect effects and require any needed action necessary to comply with the ESA.  The Service's cumulative effects analysis was consistent with the ESA, was reasonable, and should be upheld.

> **2.  To comply with the ESA, the South Project must undergo its own environmental review under ESA.**

Plaintiffs next argue that the Service's analysis of the South Project as cumulative effects is invalid because the Service cannot alter potential South Project activities in order to ensure Section 9 compliance.  Br. 49-50.  More specifically, Plaintiffs worry that the South Project's potential mining effects will never be analyzed, either because there will be no future Section 7 consultation (due to the lack of a Federal nexus from a Federal agency with some jurisdictional authority over some aspect of the South Project) or because Enefit will opt not to apply for an Section 10 incidental take permit.  While Plaintiffs' worst-case scenario is possible, it is unlikely. Enefit and the other agencies working with Enefit have all consistently stated that the South Project will fully comply with the Upper Colorado River Endangered Fish Recovery Program requirements for addressing water depletions effects to endangered Colorado River fishes and any other effects due to increased contamination.  FWS_002106-07; FWS_000280; FWS_000238-39.  Plaintiffs point to no evidence to suggest otherwise.  Furthermore, and most importantly, Enefit is well aware that if it proceeds with the South Project without obtaining take coverage for the South Project's potential mining effects on endangered Colorado River fish, either the Service or Plaintiffs could bring suit for a violation of the ESA Section 9 take

prohibition.  16 U.S.C. § 1540(e)(1), (g)(1)(A).  Plaintiffs' argument is unfounded and misplaced.

### 3. The Service's cumulative effects analysis of the South Project's potential to increase contamination was reasonable.

Finally, Plaintiffs' assertion that the Service should have completed a more in-depth analysis of the increased potential for contamination in its cumulative effects analysis, *see* Br. 49-51, fares no better.  As an initial matter, details like a sequencing map of the South Project, the "life of mine production schedule," etc., were not available to the Service.  *Id.* at 37-38. Regardless, even if that information was available, it would not have changed the Service's decision; in other words, additional necessary information would still be required for a meaningful analysis of the South Project's potential for increased contaminants as cumulative effects.  The additional critical information would have to include details such as, among other things, the location of oil shale processing, the type of chemicals used in processing, location and detailed information on how excess leachate would be stored, what types of conservation measures would be implemented as part of the proposed action to prevent or reduce the potential for sediments or leachate from entering waterways, the proximity of mining and processing activities to any perennial and ephemeral streams, and, in the case of ephemeral streams, the likelihood of sediments and leachate reaching the White River via a hydrological analysis.  To the Service's knowledge, none of that information was available at the time of Section 7 consultation, nor is it available today.  *See* 16 U.S.C. § 1536(a)(2) (requiring the Service's BiOps to be based on "the best scientific and commercial data available").  It will, however, be required and analyzed once the South Project undergoes future ESA analysis.

In sum, the Service appropriately analyzed, to the extent possible, the South Project's potential cumulative effects as part of its analysis of BLM's proposed Utility Project.  The

Service determined that the Utility Project will not likely jeopardize endangered Colorado River fish or adversely modify any designated critical habitat. For these reasons, Plaintiffs' ESA arguments are without merit and should be rejected.

## V.   BLM appropriately analyzed the impacts of the RD&D and preferential leases.

Plaintiffs suggest the FEIS contains no analysis of the effects of the RD&D and preferential leases. Br. 53. They are wrong. As Plaintiffs recognize, the FEIS included a qualitative discussion of the cumulative effects of developing the RD&D and preferential leases. BLM_00008055; *see also* BLM_00007744 ("The RD&D project is discussed qualitatively in the EIS as a cumulative action to the Utility Project Proposed Action to the extent that the RD&D lease activity impacts would be incremental to those from the Utility Project."). Both the RD&D and preferential right leases were addressed, collectively with the other reasonably foreseeable future actions (under the acronym "RFFAs"), in the cumulative impacts section of the FEIS for each sub-resource. BLM_00008045.

"[A]s to impacts that are sufficiently likely to occur such that they are reasonably foreseeable and merit inclusion, the FEIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1176 (10th Cir. 2002) (citing *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)), *modified on reh'g,* 319 F.3d 1207 (10th Cir. 2003). Because "no development" was proposed for the RD&D lease at the time the FEIS was completed, BLM reasonably concluded emissions would not occur. BLM_00008060; BLM_00008055. And, at the time of the FEIS, the preferential lease was not yet approved, and the impacts of that lease, if ever applied for and approved, would be subject to its own separate NEPA analysis. BLM_00008611, BLM_00007777; 43 C.F.R. §§ 3900.50, 3926.10. Nothing in the Record evidences that Enefit has even applied for a conversion of its RD&D lease to a

commercial lease, which would be the only way the Enefit would be able to develop the preferential acreage.  It is unreasonable to require an agency to provide in its NEPA analysis a quantification of effects of reasonably foreseeable projects which are not even in a preliminary planning stage at the time of that NEPA analysis.  *See*, *e.g.*, *Colo. Envtl. Coal. v. Off. of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1211 (D. Colo. 2011), *amended on reconsideration,* No. 08-cv-01624-WJM-MJW, 2012 WL 628547 (D. Colo. Feb. 27, 2012).  Under the circumstances, where the RD&D and preferential leases were not even in early planning stages and no development was slated for either, the FEIS disclosed the information necessary for evaluating the potential cumulative effects of those leases as they related to the Utility Project.

## CONCLUSION

BLM satisfied NEPA's requirements to analyze the environmental effects of the rights-of-way.  The Service and BLM properly analyzed the effects of granting the rights-of-way on endangered species in compliance with ESA.  Thus, the Court should deny Plaintiffs' Petition for Review of Agency Action and uphold the Record of Decision granting the rights-of-way.

Respectfully submitted this 5th day of August, 2020.

JEAN E. WILLIAMS
Deputy Assistant Attorney General

*/s/ Caitlin Cipicchio*
Caitlin Cipicchio
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
202-305-0503
caitlin.cipicchio@usdoj.gov

Rickey Turner
U.S. Department of Justice
Environment and Natural Resources Division

Wildlife and Marine Resources Section
999 18th Street
Suite 370 – South Terrace
Denver, CO 80202
303-844-1373
rickey.turner@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as enlarged by the Court's June 12, 2020 Order (ECF No. 80). Relying on the word count function in Microsoft Word, the word count of this brief is 12,033 excluding the sections that Rule 32(f) exempts.

*/s/ Caitlin Cipicchio*
Caitlin Cipicchio
United States Department of Justice