Michael Toll (*admitted pro hac vice*)
Grand Canyon Trust
4404 Alcott Street
Denver, CO 80211
mtoll@grandcanyontrust.org
303-309-2165

*Attorney for Grand Canyon Trust*


Edward B. Zukoski (*admitted pro hac vice*)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
tzukoski@biologicaldiversity.org
303-641-3149

*Attorney for Center for Biological Diversity*

Heidi McIntosh (Utah State Bar No. 6277)
Michael Hiatt *(admitted pro hac vice)*
Thomas Delehanty *(admitted pro hac vice)*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
hmcintosh@earthjustice.org
mhiatt@earthjustice.org
tdelehanty@earthjustice.org
303-623-9466

*Attorneys for Living Rivers, Grand Canyon
Trust, Center for Biological Diversity,
Natural Resources Defense Council, Sierra
Club, Waterkeeper Alliance, Inc., Colorado
Riverkeeper, and Utah Physicians
for a Healthy Environment*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LIVING RIVERS, *et al.*, | No. 4:19-cv-00041-DN-PK |
| Plaintiffs, | |
| v. | |
| DAVID BERNHARDT, *et al.*, | **PLAINTIFFS' REPLY BRIEF** |
| Federal Defendants, | |
| ENEFIT AMERICAN OIL CO., | Oral Argument Requested |
| Intervenor-Defendant | Judge David Nuffer |
| | Magistrate Judge Paul Kohler |

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.      BLM violated NEPA by failing to analyze a true no-action alternative............................2

      A.      BLM's assumption of "full South Project buildout" without the
              Utility Corridor was arbitrary and capricious .........................................................3

             1.      BLM's assumption that Enefit will transport the South
                    Project's oil by alternative means lacks record support ...............................7

              2.      BLM's assumption that Enefit will satisfy the South Project's water
                    demand by alternative means lacks record support....................................10

              3.      BLM's assumption that Enefit will satisfy the South
                    Project's natural gas demand with alternative means lacks
                    record support........................................................................................13

II.     BLM's unreasonable assumption rendered the FEIS's indirect-effects analysis
      arbitrary and capricious...................................................................................................14

III.    Alternatively, the FEIS failed to take a "hard look" at the South Project's cumulative
      effects ...............................................................................................................................16

      A.     The FEIS failed to take a hard look at the South Project's water-quality
            impacts ..........................................................................................................17

      B.     The FEIS failed to take a hard look at the South Project's air pollution and
            greenhouse gas emissions...............................................................................18

IV.    The Service and BLM violated the ESA...........................................................................19

      A.     The Service erred by failing to analyze the South Project's water withdrawal,
            sedimentation, and leachate as "effects of the action."..........................................19

      B.     Even assuming Enefit would fully build the South Project without
            the Utility Corridor, the Green River withdrawal is still an "effect of the
            action." ...........................................................................................................22

      C.     Alternatively, even if the South Project's impacts are "cumulative effects," the
            Service erred by failing to analyze those effects...................................................24

      D.     BLM violated ESA section 7(a)(2) ........................................................................25

V.    BLM failed to take a hard look at the cumulative impacts of developing
      the RD&D and Preferential Leases.........................................................................26

CONCLUSION AND RELIEF SOUGHT ................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baltimore Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983)......................................................................................16

*Ctr. for Biological Diversity. v. U.S. Dep't of Interior*,
    623 F.3d 633 (9th Cir. 2010) ...............................................................4, 25

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
    302 F. Supp. 3d 1251 (D. Colo. 2018)......................................................25

*Copar Pumice Co., Inc. v. Tidwell*,
    603 F.3d 780 (10th Cir. 2010) ..................................................................21

*Consol. Salmonid Cases*,
    688 F. Supp. 2d 1013 (E.D. Cal. 2010).....................................................21

*Cure Land, LLC v. U.S. Dep't of Agric.*,
    833 F.3d 1223 (10th Cir. 2016) .................................................................11

*Diné Citizens Against Ruining Our Env't v. Bernhardt*,
    923 F.3d 831 (10th Cir. 2019) ....................................................17, 18, 19

*Envtl. Defense Fund, Inc. v. Andrus*,
    619 F.2d 1368 (10th Cir. 1980) .................................................................17

*Hammon v. Norton*,
    370 F. Supp 2d 266 (D.D.C. 2005)..............................................................5

*Int'l Snowmobile Mfrs. Ass'n. v. Norton*,
    304 F. Supp. 2d 1278 (D. Wyo. 2004).......................................................11

*Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*,
    602 F.3d 687 (5th Cir. 2010) ....................................................................21

*Olenhouse v. Commodity Credit Corp.*,
    42 F.3d 1560 (10th Cir. 1994) ......................................................3, 10, 12, 14

*Oregon Natural Desert As'n v. BLM*,
    531 F.3d 1114 (9th Cir. 2008) ...................................................................18

*Res. Ltd., Inc. v. Robertson*,
    35 F.3d 1300 (9th Cir. 1993) ....................................................................25

*New Mexico ex rel. Richardson v. BLM*,
   565 F.3d 683 (10th Cir. 2009) ...................................................................3, 12, 18

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)...................................................................................................16

*Rocky Mountain Wild v. Vilsack*,
   2013 WL 3233573 (D. Colo. June 26, 2013).........................................................18

*Sierra Club v. BLM*,
   786 F.3d 1219 (9th Cir. 2015) ............................................................................20, 21

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017)........................................................................17, 18, 19

*Sierra Club v. Kenna*,
   2013 WL 144251 (E.D. Cal. Jan. 11, 2013) ...........................................................20

*S. Utah Wilderness Alliance v. U.S. Dep't of Interior*,
   250 F. Supp. 3d 1068 (D. Utah 2017)....................................................................18

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
   305 F.3d 1152 (10th Cir. 2002) .............................................................................4, 10

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) .................................................................................16

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010) .................................................................................20

*WildEarth Guardians v. BLM*,
   870 F.3d 1222 (10th Cir. 2017) ...................................................................... <i>passim</i>

## Statutes and Regulatory Citations

Utah Code Ann. §§ 73-3-3, 73-3-7 ...........................................................................12

40 C.F.R. § 1502.16 ..................................................................................................16

40 C.F.R. § 1502.22 ..................................................................................................17

50 C.F.R. § 402.02 ..........................................................................................19, 22, 23

## INTRODUCTION

The central issue in this case is whether the Bureau of Land Management (BLM) unreasonably assumed that Enefit would build the South Project to full capacity if the agency denied the Utility Corridor rights-of-way. The only evidence in the record that BLM and Enefit cite in support of this assumption are Enefit's unsubstantiated assurances. Defendants point to nothing showing that BLM independently evaluated those assurances, even though Enefit had earlier admitted that the claimed alternative sources of water, natural gas, and oil product transport would be infeasible to satisfy the utilities needed for the South Project's full buildout. There is thus no rational connection between the record and BLM's assumption. Therefore, the Final Environmental Impact Statement (FEIS), the Biological Opinion (BiOp), and the Record of Decision (ROD) all based on that assumption are arbitrary and capricious and should be set aside.

If the Court nevertheless accepts the government's core assumption, the Fish and Wildlife Service (Service) still violated the Endangered Species Act (ESA). This is so because, as Enefit has repeatedly admitted, its massive withdrawal of water from the Green River and the resulting harm to endangered fish would only occur if BLM approved the Utility Corridor. Even if Enefit would fully develop the South Project without the Utility Corridor, each alternative water source that Enefit has presented would draw water from a distant location in a different watershed. Yet the BiOp did not analyze the harms from Enefit's Green River withdrawal as an effect of the Utility Corridor. This violated the ESA, regardless of how the Court rules on Plaintiffs' other claims.

1

## ARGUMENT

### I.     BLM violated NEPA by failing to analyze a true no-action alternative.

In 2014 and 2015, as BLM was preparing its draft EIS, the agency asked Enefit to provide information about the alternative utilities the company would use to supply the South Project without the Utility Corridor.[1] Enefit responded in several letters and emails by listing numerous options, but candidly explained why many were speculative or economically and technically infeasible.[2] Nonetheless, the 2016 draft EIS concluded that Enefit would use those other options to fully develop the South Project if BLM denied the Utility Corridor under the no-action alternative.[3] But the draft EIS also, in Enefit's words, specifically "dismissed" most of the alternative utilities "because of feasibility issues."[4] Because of that dissonance, the EPA commented that the EIS's core assumption of full buildout of the South Project under the no-action alternative, which "is foundational to an appropriate analysis of impacts," was "unsupported."[5]

As a result, in 2016, BLM "request[ed] information" from Enefit about the technical and economic feasibility of alternative utilities that could completely substitute for the Utility Corridor, including "feasibility studies … or other analyses."[6] In response, Enefit sent BLM two letters in 2016 and 2017, which recapitulated a subset of the very same utilities previously deemed infeasible.[7] Enefit provided no studies or analysis, nor did it attempt to explain away its

---

[1] *See, e.g.*, BLM_00000015; BLM_00001534.
[2] BLM_00000041-43; BLM_00001536-545; BLM_00001549-559.
[3] BLM_00006966.
[4] BLM_00004310 (referring to BLM_00007063).
[5] BLM_00008534.
[6] BLM_00001758-59.
[7] BLM_00001762; BLM_00001774.

prior concession that those alternatives were infeasible. It merely offered conclusory assurances that it could pursue those alternative utilities. BLM then parroted those letters nearly verbatim in the FEIS, and even listed as viable options some of the utility sources Enefit had dropped from its last correspondence.[8] But BLM never independently analyzed the utilities' feasibility. The FEIS simply assumed under the no-action alternative that "the South Project will proceed to full buildout"—producing "50,000 barrels of oil per day"—"regardless of the BLM's decision" on the Utility Corridor because the "required utilities would be secured by alternative means."[9] The FEIS's conclusion, and the no-action alternative based on that determination, are therefore arbitrary and capricious.

> **A.    BLM's assumption of "full South Project buildout" without the Utility Corridor was arbitrary and capricious.**

An agency conclusion is arbitrary unless the record shows the agency "examine[d] the relevant data and articulate[d] a rational connection between the facts found and the decision made."[10] Under Tenth Circuit law, that standard has two requirements. First, an agency's conclusion must be supported by "substantial evidence in the record."[11] "Evidence is not substantial if it is overwhelmed by other evidence, or if it constitutes mere conclusion."[12] Second, the record must show the agency's reasoning or analysis in support of that conclusion.[13] And when an agency's conclusion is based on information from an applicant, BLM is

---

[8] *Compare* BLM_00008123-27 *with* BLM_00001766-1769 *and* BLM_00001774-78.
[9] BLM_00007743, 00007763, 00007771, 00008071.
[10] *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 713 (10th Cir. 2009).
[11] *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580-81 (10th Cir. 1994).
[12] *Id.* (citations omitted).
[13] *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1238 (10th Cir. 2017).

"obligat[ed] under NEPA to evaluate [the applicant's] submitted information independently," creating a record that shows the agency "verif[ied] the accuracy of [the] information."[14]

BLM does not dispute this controlling law. And it agrees that the "[o]ther cases cited by Plaintiffs" outside the Tenth Circuit have deemed it unreasonable for the government to base a decision only on an applicant's information without any independent substantiation by the agency, particularly when that information is unreliable or otherwise "suspect."[15] BLM's conclusion that Enefit would fully build the South Project if it denied the Utility Corridor violates these requirements.

Defendants attempt to justify BLM's conclusion in two ways, neither of which has merit. First, they contend the FEIS's assumption is supported by Enefit's statements,[16] and that there was no reason to question the reliability of the company's assurances.[17] But the *only* record evidence purporting to show the feasibility of alternative utilities that would satisfy the South Project's full-buildout needs are Enefit's conclusory assertions.[18] And those assurances—unsupported by any analysis or studies—are not reliable because Enefit and BLM previously

---

[14] *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165, 1181 (10th Cir. 2002) (citing 40 C.F.R. § 1506.5(a)), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003).

[15] Federal Defendants' Answer Brief (Feds.Br.), ECF 82, p.18.

[16] Enefit argues that *WildEarth Guardians* and *Ctr. for Biological Diversity*, 623 F.3d 633 (9th Cir. 2010), are distinguishable because the records in those cases included nothing supporting the agency's assumption, whereas here the record contains Enefit's assurances. Enefit's Answer Brief (Enef.Br.), ECF 83, pp.3-4. Yet that in no way undermines the applicability of their holdings that the assumption must be supported by substantial evidence and the agency's analysis on the record.

[17] Feds.Br. pp.18-19; Enef.Br. pp.4-6.

[18] While Enefit argues that BLM supposedly "did not simply rely on the 'representations by the applicant alone,' but on substantial additional information," it cites no such information. Enef.Br. p.6.

determined those alternative utilities to be infeasible. Accordingly, the record lacks substantial evidence to support BLM's conclusion.

Second, Defendants argue that BLM did in fact independently substantiate Enefit's information about the alternative utilities.[19] But on that score, Defendants point only to the "back and forth" between BLM and Enefit, explained above.[20] They argue that BLM's mere *receipt* of information and assurances from Enefit is tantamount to *analyzing* that information to determine whether the alternative utilities were viable to satisfy the South Project's full-buildout needs.[21] Yet they point to no record evidence—because there is none—showing that BLM independently verified Enefit's claims. While BLM asserts that the FEIS explored the viability of alternative utilities, the pages in the FEIS that Defendants cite simply parrot Enefit's conclusory 2016 and 2017 letters.[22] The FEIS includes *zero* analysis by BLM of the viability of the alternative utilities. But evidence showing BLM's independent substantiation is precisely what the Tenth Circuit and courts around the country demand. Lacking that, and given that all the evidence in the record undermines Enefit's unsubstantiated assurances, the FEIS's central assumption and its analysis of the no-action alternative were arbitrary and capricious.[23]

---

[19] Feds.Br. pp.17-18 (attempting to distinguish *Hammond*, 370 F. Supp. 2d 226 (D.D.C. 2005) and *Simmons*, 120 F.3d 664, 668–69 (7th Cir. 1997)). Defendants also contend *Hammond* is factually distinguishable, but offer no reason—and indeed there is none—why that would change the applicability of *Hammond's* holding that BLM has a duty to substantiate an applicant's statements.

[20] Feds.Br. pp.16-17; Enef.Br. pp.2-3.

[21] Feds.Br. p.17; Enef.Br. pp.2-3.

[22] *Supra* n.8.

[23] Defendants also note that courts have held no-action alternatives to be reasonable despite assuming future development by private parties. Feds.Br. pp.19-20; Enef.Br. p.7. But Plaintiffs do not contend that no-action alternatives, as a rule, cannot assume future development. Rather, here, it was unreasonable for the no-action alternative to assume Enefit would *fully* build the South Project where the record does not support that assumption.

Critically, Enefit also asserts that the South Project's "full" buildout without the Utility Corridor, rather than a scaled-down operation, was "not particularly relevant" to BLM's assumption under the no-action alternative.[24] Enefit thus argues that a lack of evidence showing the viability of the alternative utilities to satisfy the South Project's full-buildout demand is inconsequential because without the rights-of-way, Enefit would simply develop a "*[s]caled [d]own*" facility.[25] In making that argument, however, Enefit has toppled its house of cards. The assumption of a "full buildout … 50,000-barrels per day operation"[26] even without the Utility Corridor, rather than a scaled down project, "was key to [BLM's] ultimate decision"[27] and the lynchpin of this case, for it is that assumption that led BLM to conclude that its choice between the proposed action and no-action alternative would not change the South Project's impacts. And because the alternative utilities themselves would be more harmful than the rights-of-way, that assumption led to BLM's backwards conclusion that denying the Utility Corridor would be *more* environmentally harmful than approving it.[28] BLM's ROD expressly relied on this reasoning.[29] But a scaled-down South Project under the no-action alternative—with less strip mining, less oil-shale processing, and fewer barrels of oil produced each year—would have different, and surely

---

[24] Enef.Br. p.3 n.17.

[25] *Id.* pp.10-11; *id.* p.3 n.17 ("South Project could be developed in a different form, or even if fully developed, would operate at different capacity levels" without rights-of-way); *id.* p.19 (if alternative natural-gas sources are "insufficient for full buildout production levels, … the plant [would] occasionally (or even regularly) ha[ve] to operate at less than full production level").

[26] BLM_00008120.

[27] *See WildEarth Guardians*, 870 F.3d at 1237.

[28] *See, e.g.*, BLM_00008061 ("South Project will proceed to full buildout regardless of the BLM's decision," and thus under "the No Action Alternative, emissions…are generally going to be higher than…[under] the Proposed Action" because Enefit will "utilize trucks" rather than pipelines).

[29] BLM_00008835, 00008845.

less harmful, impacts than a fully developed operation. Enefit's crucial admission in its brief thus undermines the FEIS and ROD's reasoning, rendering them arbitrary and capricious.

### 1. BLM's assumption that Enefit will transport the South Project's oil by alternative means lacks record support.

If BLM denied the rights-of-way, the FEIS claims that Enefit would transport the South Project's 50,000 barrels-per-day of oil output to refineries by running hundreds of trucks "around [the] clock"[30] every day for more than 30 years along Dragon Road[31]—"an unpaved rural" dirt road with "sharp horizontal and vertical curves, steep slopes, … virtually no drainage structures,"[32] and "limited visibility."[33] Enefit admitted to BLM in 2014 that the amount of increased traffic Dragon Road could handle without improvements was "undetermined."[34] Still, Enefit assured BLM that Dragon Road could handle the massive increase in around-the-clock industrial truck traffic.[35] Yet Defendants point to no record evidence—because none exists—showing that Enefit or, more importantly, BLM ever evaluated Dragon Road's capacity without improvements. Instead, Defendants make three arguments, none of which show that BLM fulfilled NEPA's requirements.

First, Enefit does not dispute the accuracy of its prior admission to BLM that trucking oil would be "nearly 1,400% more expensive than pipeline transport," and "would ultimately prove to be *neither practical nor economically feasible at target South Project production levels*."[36]

---

[30] BLM_00001542.
[31] BLM_00008126-27.
[32] BLM_00008888.
[33] BLM_00005899.
[34] BLM_00000016.
[35] BLM_00001777-78.
[36] BLM_00001544 (emphasis added).

Rather, Enefit claims those statements were not about Dragon Road, but referred to the infeasibility of trucking on U.S. Highway 40.[37] Yet whether the admitted infeasibility of trucking applies to U.S. 40 or Dragon Road is irrelevant because Enefit has explained that the route for trucking the South Project's oil necessarily would use *both* Dragon Road *and* U.S. 40.[38] Enefit thus continues to admit that trucking the South Project's oil without the Utility Corridor would be impractical and economically infeasible. This admission alone is sufficient to find BLM's assumption that Enefit would fully build the South Project without the Utility Corridor to be arbitrary and capricious.[39]

Second, BLM argues that the "comparators" Enefit provided of other oil projects in the Uinta Basin show "why they believed" an unpaved Dragon Road "was viable" for trucking the South Project's oil.[40] Specifically, the agency points to Enefit's 2017 letter, which cited a 2017 article in which the president of Uintah Advantage said that its proposed 40,000 barrel-per-day conventional oil facility in the Uinta Basin would run about 250 trucks roundtrip each day.[41] If that was feasible, BLM concluded, then trucking the South Project's oil must also be feasible, since the truck numbers were comparable. But BLM neglects to mention that the article also quotes Uintah Advantage's president explicitly stating: "*We really need a paved road*" to accommodate "daily traffic [of] 250 trucks hauling crude in and 250 trucks hauling product

---

[37] Enef.Br. pp.11-12.

[38] BLM_00001542 (transporting the South Project's oil would require trucks to travel U.S. 40 to reach refineries); BLM_00008154 (trucks would travel "on Dragon Road, … and U.S. 40.").

[39] Enefit highlights that its earlier admission also stated that given the "impractical trucking situation[] under the No Action alternative, [Enefit] may evaluate development of a new pipeline trans-loading terminal in the region." Enef.Br. p.12. The FEIS, however, dismissed "such a development [as] speculative," and did not consider it. BLM_0008127.

[40] Feds.Br. p.13.

[41] *Id.* (citing BLM_00001778).

out."[42] He reiterated: "the facility would *require* a … paved road."[43] Had BLM independently examined Enefit's assertion, it would have concluded that this point of comparison did not in fact demonstrate Enefit's trucking theory to be feasible, but rather the opposite.

Third, Defendants argue that a draft agreement in which Uintah County "indicated their willingness" to provide increased maintenance on Dragon Road is evidence of the viability of trucking the South Project's oil.[44] Yet that agreement would simply allow Uintah County to perform "routine maintenance" on Dragon Road.[45] But it does not follow that increased maintenance would allow for the massive increase in truck volume at issue. Indeed, the capacity of Dragon Road remains unanalyzed. Moreover, the agreement specifically excludes straightening or "resurfacing,"[46] which would require BLM's approval of the Utility Corridor.[47] Particularly given that the comparison BLM draws to the Uintah Advantage project indicates that paving would be required, a mere maintenance agreement does not support BLM's assumption that Enefit could truck the South Project's oil.

It was arbitrary and capricious for BLM to have made that assumption without any independent analysis, without support in the record, and despite Enefit's admission—confirmed in its brief—that trucking would be impractical and economically infeasible. Concluding that

---

[42] UBMedia, "$1.375 billion crude-upgrader planned for Leland Bench" (Feb. 9, 2017), https://ubmedia.biz/news/9139/1375-billion-crude-upgrader-planned-for-leland-bench/ (cited in BLM_00001778). Also posted on Uintah Advantage's website: www.uaxa-ut.com/post/surging-fuel-demand-prompts-marathon-petroleum-s-23-billion-deal.

[43] *Id.*

[44] Feds.Br. p.13 (quoting BLM_00001778).

[45] BLM_00001781-82.

[46] *Id.*

[47] BLM_00015220 ("Road improvements to Dragon Road…require a [right-of-way] grant."); BLM_00007064 (under no-action alternative, "[n]o improvements would be made to Dragon Road…. [It] would be used as is").

Enefit would fully build the South Project without the Utility Corridor therefore violated the APA.[48]

        **2.**      **BLM's assumption that Enefit will satisfy the South Project's water demand by alternative means lacks record support.**

If BLM denied the Utility Corridor rights-of-way, Enefit claims that "water usage [at the South Project] would be the same," but it would secure water from a different source than its planned Green River withdrawal.[49] Enefit initially claimed that the company has four options: (1) trucking water to the site; (2) withdrawing water from the White River; (3) pumping groundwater under water right #49-1639; and (4) converting existing groundwater monitoring wells on the South Project site to water supply wells and pumping water from them using the same water right (#49-258) Enefit planned to use with the Utility Corridor.[50] In its brief, BLM acknowledges that prior to the FEIS, Enefit "abandoned" trucking and "rejected" the White River water withdrawal as potential options because they were not economically or technically feasible.[51] BLM's assumption that the South Project's water needs could be satisfied without the Utility Corridor, the agency concedes, thus was based on the two remaining options.[52]

Regarding the option of pumping groundwater under water right #49-1639, Defendants do not dispute that this water right would provide *less than one-half of one percent* of the South

---

[48] *See WildEarth Guardians*, 870 F.3d at 1236; *Utahns*, 305 F.3d at 1165; *Olenhouse*, 42 F.3d at 1580-81.

[49] BLM_00001768.

[50] BLM_00008124-25.

[51] Feds.Br. p.14.

[52] *Id.* Accordingly, Enefit's arguments about the feasibility of trucking and the White River withdrawal are irrelevant. *See also* Plaintiffs' Opening Brief (Pls.Br.), ECF 81, pp.27-29 (explaining lack of record evidence supporting the feasibility of trucking and White River withdrawals).

Project's needs, leaving more than 99 percent of its demand unsatisfied.[53] Consequently, converting monitoring wells to supply wells is the only option that would allegedly satisfy the South Project's full-buildout water demand. Yet the feasibility of that option is unsupported by the record.[54] Defendants respond in two ways.

First, BLM does not dispute the draft EIS's conclusion that "[b]ased on BLM's knowledge of hydrography in the area," Enefit's plan to pump groundwater from converted monitoring wells would "*not ... be sufficient to meet [the South Project's] water demands*."[55] Rather, BLM responds that because that statement is "not present in the FEIS," it "indicat[es]" the agency must have been subsequently "assured of the feasibility" after a "review of additional materials."[56] The agency cites to no such additional materials. And the record is devoid of any, for there is no evidence concerning the viability of this option beyond BLM's infeasibility determination in the draft EIS. Having made an about-face on a key factual finding without explanation or support, BLM's conclusion that the South Project's water needs could be met without the Utility Corridor was arbitrary and capricious.[57]

Second, Defendants concede that Enefit could not pump a single drop of water from converted wells unless the water right's owner, Deseret Generation and Transmission

---

[53] Feds.Br. p.15 (water-right 49-1639 could satisfy only "early phases" of South Project); Pls.Br. p.29.
[54] Pls.Br. pp. 28-30.
[55] BLM_00007063 (emphasis added); *see* Ps.Br. p.28.
[56] Feds.Br. p.15.
[57] *See, e.g.*, *Int'l Snowmobile Mfrs. Ass'n. v. Norton*, 304 F. Supp. 2d 1278, 1292 (D. Wyo. 2004) (reversal from draft to final EIS on a critical finding, without explanation, was unlawful); *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1232 n.6 (10th Cir. 2016) (lack of record explanation for inconsistencies between published NEPA documents renders agency's decision arbitrary).

Cooperative, applies for and receives authorization to do so from the Utah Division of Water Resources (UDWR).[58] Indeed, Enefit admits it merely has a "contractual right to *use*" water according to the terms of Deseret Generation's water right, which would not allow pumping from the converted wells.[59] Defendants point to no record evidence—because there is none— showing that Deseret Generation will even apply to UDWR for the required authorization.[60] Regardless, converting the water right is speculative, as formally changing a water right is a years-long, uncertain process that often includes an adjudicatory proceeding.[61] All told, Defendants do not dispute that Enefit has no legal right to pump groundwater from converted wells, and there is nothing in the record indicating that it ever will.

 The record provides no basis for BLM to retreat from its conclusion in the draft EIS that converting monitoring wells would "*not ... be sufficient to meet [the South Project's] water demands*," and it likewise provides no support for deeming any other alternative source of water to be feasible. BLM's assumption that Enefit would fully develop the South Project without the Utility Corridor therefore was arbitrary and capricious.[62]

---

[58] Feds.Br. pp.14-15; Enef.Br. p.13.

[59] BLM_00001817 (emphasis added).

[60] Quoting from an uncited, unnamed source—perhaps hoping the Court will assume it is in the record—Enefit contends that Deseret Generation must "undertake all other actions…[to] develop WRN 49-258 for use by the Project." Enef.Br. pp.13-14. Even assuming that quote is accurate, its import is unclear. Regardless, the document Enefit quotes is neither a public document *nor part of the record* before the agency, and Enefit's contention is "post-hoc rationalization concocted by counsel." *See Richardson*, 565 F.3d at 704.

[61] *See* Utah Code Ann. §§ 73-3-3, 73-3-7.

[62] *Olenhouse*, 42 F.3d at 1580-81; *WildEarth Guardians*, 870 F.3d at 1236.

### 3.     BLM's assumption that Enefit will satisfy the South Project's natural gas demand with alternative means lacks record support.

Enefit intends to obtain the South Project's necessary hydrogen supplies by running the Utility Corridor's natural gas through an "SMR-PSA" unit.[63] By 2017, Enefit informed BLM that, without the Utility Corridor, it would obtain natural gas from Summit Midstream's existing pipeline to feed the SMR-PSA unit, having abandoned any mention of the other two options the company previously had floated.[64] According to Enefit's letters to BLM, however, Summit has "indicated their interest" in providing natural gas in an amount that would satisfy *less than 5 percent* of the South Project's natural gas demand.[65] Defendants do not dispute this.[66] Instead, they note only that the capacity of Summit's pipeline is larger than the amount Summit has "indicated their interest" in providing to Enefit, apparently hoping the Court will infer that Summit theoretically could satisfy the South Project's demand.[67] They cite nothing in the record to support their position.

Enefit alone also argues that the two other options it originally floated—natural gas liquids and a partial oxidation unit—could both be used to supplement the inadequate supply of natural gas from the Summit pipeline.[68] Yet Enefit admitted that it "*has not considered* [natural gas liquids] as a *viable* hydrogen source … due to economics," and it points to nothing in the

---

[63] BLM_00001537; BLM_00008124.
[64] BLM_00001774-75; Pls.Br. p.31.
[65] BLM_00001774; Pls.Br. p.32
[66] Feds.Br. p.15 (Summit's pipeline would provide a "lower flow rate than Enefit would need to fully supply the South Project").
[67] Enef.Br. pp.18-19; Feds.Br. p.15.
[68] Enef.Br. p.19.

record showing that it—let alone BLM—has ever changed this position.[69] And while Enefit admits it is "unlikely that deployment of a [partial oxidization] unit would be economical when *compared to* deployment of an SMR-PSA unit"[70] (which would be used if Enefit obtains natural gas from Summit[71]), Enefit offers no explanation or record support for how it would then be economically feasible to deploy a partial oxidation unit *in addition to* an SMR-PSA unit.

There is no record evidence showing the feasibility of satisfying the natural gas demand of a fully developed South Project without the Utility Corridor, and no evidence showing that BLM independently evaluated Enefit's unsubstantiated assurances on that subject. Accordingly, the FEIS's core assumption—and the no-action alternative—were arbitrary and capricious.[72]

## II. BLM's unreasonable assumption rendered the FEIS's indirect-effects analysis arbitrary and capricious.

The FEIS did not analyze the effects of the South Project as indirect effects of the Utility Corridor.[73] BLM's rationale was that the South Project's impacts are "not caused by the Utility Project" because the South Project "will proceed to full buildout regardless of the BLM's decision."[74] The FEIS's indirect-effects analysis therefore was arbitrary and capricious for the same reason the no-action alternative was fatally flawed: the record does not support BLM's

---

[69] *Id.* p.17 (quoting BLM_00001538). Moreover, there is also nothing in the record showing that Mapco, the owner of the NGL pipelines, is willing or able provide NGL to Enefit. *See* BLM_00001538.

[70] BLM_00001539 (emphasis added); *see* Enef.Br. p.18.

[71] BLM_00001537-38.

[72] *Olenhouse*, 42 F.3d at 1580-81; *WildEarth Guardians*, 870 F.3d at 1236.

[73] BLM_00002117.

[74] *Id.*

assumption that Enefit will build the South Project, undiminished in scale, without the Utility Corridor.[75]

BLM does not dispute that the reasonableness of that central assumption is dispositive of the reasonableness of the FEIS's indirect-effects analysis.[76] Enefit alone makes two additional arguments. First, Enefit contends that the FEIS need not have analyzed the South Project's impacts as indirect effects of the Utility Corridor because the South Project is not also a "connected action" under NEPA.[77] Enefit cites no legal authority—and indeed there is no support in the statute, regulations, or case law—for its novel position that the absence of a "connected action" somehow subtracts from the set of effects that must otherwise be analyzed as indirect effects of the proposed action. Moreover, the government does not support Enefit's position. BLM's brief expressly concedes that both Instruction Memorandum No. 2018-023— which deals specifically with "non-Federal actions" that are not "connected actions"—and NEPA regulations "require that BLM consider as indirect effects … the South Project and its effects [that] can be prevented or modified by the BLM's decision-making on the Utility Project."[78] Whether the South Project is a connected action is thus irrelevant.

Second, Enefit contends, again citing no case law, that even if the FEIS's core assumption was unreasonable, the deficient indirect-effects analysis was "[i]mmaterial" because

---

[75] *See* *WildEarth Guardians,* 870 F.3d at 1235 (That BLM's "assumption lacks support in the record is enough for us to conclude that the analysis which rests on this assumption is arbitrary and capricious.").

[76] Feds.Br. p.20.

[77] Enef.Br. pp.21-22.

[78] Feds.Br. p.21 (citing IM No. 2018-023 (Sept. 10, 2018), https://www.blm.gov/policy/pim-2018-023).

the South Project's impacts were discussed in the FEIS as "cumulative effects."[79] But this argument misses a crucial point about the core NEPA claim in this lawsuit, which is that BLM's characterization of the South Project's effects was pivotal to its presentation of alternatives and the choice between them. The primary purpose of an EIS is to inform the agency and the public of the "environmental consequences" caused by the proposed action,[80] which are the action's direct and indirect effects.[81] Cumulative effects, by contrast, are background effects that would occur regardless of the proposed action and thus, as the FEIS explains, "are not attributable to" BLM's approval of the Utility Corridor.[82] Failing to analyze the South Project's environmental impacts as indirect effects thus subverted the "key requirement of NEPA" to "consider and disclose" to the public "the actual environmental effects" caused by BLM's approval of the Utility Corridor and "bring[] those effects to bear on [its] decision[]."[83]

**III.    Alternatively, the FEIS failed to take a "hard look" at the South Project's cumulative effects.**

The Court need not reach this alternative argument if it finds that the FEIS's core assumption—and the no-action alternative and indirect-effects analysis flowing from that assumption—were arbitrary and capricious. Yet even if, for the sake of argument, the South Project's impacts were properly considered "cumulative effects," BLM nonetheless failed to take a hard look at those effects.

---

[79] Enef.Br. pp.22-2.
[80] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004).
[81] 40 C.F.R. § 1502.16 (2018).
[82] BLM_00007752.
[83] *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 96 (1983).

**A.      The FEIS failed to take a hard look at the South Project's water-quality impacts.**

The Tenth Circuit in *Diné Citizens* held that BLM was required to quantify cumulative impacts in an EIS when the agency "had non-speculative figures that it could use."[84] BLM does not dispute this obligation.

The FEIS stated that it could not "quantify specific impacts" from the South Project on water resources because the "proposed locations for surface disturbance," the location of "oil shale processing activities," and the "footprint data for the South Project" are "unknown."[85] The record belies this claim, for it includes a "sequencing map," a "life of mine production schedule," and more.[86] In response, Defendants argue both that the map and other information is unreliable because it was prepared for a so-called "Prefeasibility Mining Study" in 2012, and that more information would have been required.[87] But in 2016, BLM specifically affirmed that "Enefit's pre-feasibility study … (or applicable excerpts) which outline the proposed activity on the South Project, … will assist BLM in *quantifying* the reasonably foreseeable cumulative impacts

---

[84] *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 858 (10th Cir. 2019); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) (without a quantitative estimate of impacts, "it is difficult to see" how an agency "could engage in informed decision making" with respect to those impacts "or how informed public comment could be possible"); *Envtl. Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1375 (10th Cir. 1980) ("hard look" requires "detailed discussion" of environmental effects if the necessary information can be "readily ascertained").

[85] BLM_00008073-75. Additionally, Enefit's brief argues at length that, because some detailed South Project information allegedly is "unavailable," 40 C.F.R. § 1502.22 excuses the missing quantitative analysis. Enef.Br. pp.28, 33. But that is irrelevant, for Plaintiffs' argument does not concern information that may be unavailable, but rather information in the record.

[86] Pls.Br. pp.37-38.

[87] Enef.Br. p.29. BLM also argues that the map should be discounted because it "incorrectly projects a 2019 mining start date." Feds.Br. p.25. Given that the ROD was issued in 2018, the delayed mining start date is irrelevant.

associated with the development of the South Project."[88] What's more, the record also includes Enefit's detailed GIS map shapefile data, which according to the company, "depict the location of both the industrial plant and the oil shale mining area."[89]

The record thus includes the exact information BLM originally claimed it needed to quantitatively estimate the South Project's water-quality impacts. The record lacks, however, "a satisfactory explanation for why" a "quantification … [was not] feasible" in light of that information.[90] And Defendants' argument that even more information would be required amounts to mere "post-hoc rationalization concocted by counsel."[91] BLM thus failed to take a hard look at the South Project's water-quality impacts, rendering the FEIS arbitrary and capricious.[92]

**B.      The FEIS failed to take a hard look at the South Project's air pollution and greenhouse gas emissions.**

According to the EPA, BLM's 2013 Oil Shale Programmatic EIS (Oil Shale PEIS) includes "adequate information" for BLM "to provide a quantified estimate of [the South Project's emissions] impacts."[93] In response, BLM argues that it disagreed with the EPA and that its disagreement is owed deference.[94] But BLM points to nothing in the record explaining its disagreement, and the Court "cannot defer to a void."[95] Enefit's additional argument that the two

---

[88] BLM_00001760 (emphasis added).
[89] BLM_00001763.
[90] *See Sierra Club*, 867 F.3d at 1374.
[91] *Richardson*, 565 F.3d at 704; *see also SUWA v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 1068, 1078 (D. Utah 2017).
[92] *Diné*, 923 F.3d at 858-59; *WildEarth Guardians*, 870 F.3d at 1233.
[93] BLM_00005914.
[94] Feds.Br. p.28.
[95] *Richardson*, 565 F.3d at 715 (quoting *Or. Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1142 (9th Cir. 2008)); *see also Rocky Mountain Wild v. Vilsack*, 2013 WL 3233573, at *3 n.3 (D.

projects are in fact dissimilar because of the different oil production rates and different "retorting technolog[ies]"[96] is undermined by the FEIS's statement that Enefit "identified that many of the BLM's values used in that [Oil Shale PEIS] analysis are in line with the South Project assumptions for a production rate of 50,000 barrels per day," and that the Oil Shale PEIS analyzed a "similar surface retorting technolog[y]."[97]

Because the record does not contain "a satisfactory explanation for why" a "quantification … [was not] feasible"[98] based on the evidence in the record, the FEIS failed to take a hard look at the South Project's air pollution and greenhouse gas emissions.[99]

## IV.   The Service and BLM violated the ESA.

### A.   The Service erred by failing to analyze the South Project's water withdrawal, sedimentation, and leachate as "effects of the action."

Under the ESA, "effects of the action"—which include "indirect effects" and effects of interrelated or interdependent actions—are those effects that would not occur "but for" the proposed action and are "reasonably certain to occur."[100] The Service argues that its amended Biological Opinion (BiOp) did not analyze the South Project's impacts on endangered fish as effects of the action because, following BLM's lead, it assumed "the South Project will be constructed with or without the Utility Project" and thus "was not the 'but for' causation of the

---

Colo. June 26, 2013) ("a court cannot defer when there is no analysis to defer to, and a court cannot accept at face value an agency's unsupported conclusions.").

[96] Enef.Br. p.34.

[97] BLM_00008118.

[98] See *Sierra Club*, 867 F.3d at 1374.

[99] See *Diné,* 923 F.3d at 858. Moreover, that a quantification *may* occur later during EPA's Clean Air Act permitting process does not excuse the FEIS's missing quantitative analysis. The "existence of permit requirements overseen by another federal agency or state permitting authority cannot substitute for a proper NEPA analysis." *Sierra Club*, 867 F.3d at 1375.

[100] 50 C.F.R. § 402.02 (2018); FWS_000537; Enef.Br. p.38.

South Project."[101] Because that central assumption was arbitrary and capricious, as explained above, the BiOp's failure to analyze the South Project's impacts as "effects of the action" likewise was arbitrary and capricious.[102]

The Service does not dispute that the reasonableness of that assumption is dispositive of the BiOp's lawfulness. But in an attempt to bolster their position that the assumption was reasonable and thus the Utility Corridor is not the but-for cause of the South Project, the Service and Enefit cite the Ninth Circuit's *Sierra Club* opinion.[103] Their argument on that score falls short.

In *Sierra Club*, the court held that BLM's approval of a right-of-way was not the but-for cause of the impacts from a private wind project because BLM reasonably concluded that the applicant had viable alternative road access to the project.[104] But unlike here, there was no indication in that case that the applicant or the agency admitted the alternative road access would be technically or economically infeasible.[105] And unlike here, the agency in *Sierra Club* did not rely solely on the applicant's assurances, but instead analyzed a third-party "report … address[ing] the feasibility" of the alternative access and only then determined that the

---

[101] Feds.Br. p.32.

[102] That the Service followed BLM's lead regarding the "effects of the action" does not excuse its flawed BiOp. The Service has an independent duty to properly define the "effects of the action" on which it consults. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 520-24 (9th Cir. 2010) (rejecting Service's truncation of a project's scope and resulting flawed impacts analysis where Service simply "endorsed" the action agency's proposed scope).

[103] Feds.Br. pp.33-34; Enef.Br. pp.42-43.

[104] *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1223-25 (9th Cir. 2015).

[105] *See Sierra Club v. Kenna*, 2013 WL 144251 at *2-3 (E.D. Cal. Jan. 11, 2013).

alternative access was "technically and economically feasible" and "neither remote nor speculative."[106]

The same analysis applies to Enefit's citation to the Fifth Circuit's *Medina* opinion.[107] There, the court held that an agency's approval of a railway was not the but-for cause of the impacts from a limestone quarry because the agency reasonably concluded that the applicant could transport the limestone by truck without the railway.[108] But again, in that case the feasibility of the trucking alternative was not "seriously contest[ed]," for the record evidence showed the agency "extensively analyzed the physical and economic feasibility" of the trucking alternative and determined that "truck transport … would be feasible."[109] Critically, unlike here, in *Medina* the EIS documented that the agency "conducted additional research" on that subject beyond the applicant's assurances.[110] And that illustrates what is lacking in this case: BLM's independent analysis of the feasibility of the alternative utilities to satisfy the South Project's full-buildout needs. Moreover, in *Medina* the record did not reveal inconsistencies in the

---

[106] *Sierra Club*, 786 F.3d at 1224.
[107] Enef.Br. pp.43-44.
[108] *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 700-01 (5th Cir. 2010).
[109] *Id.* at 697.
[110] Final EIS, Medina Railway, 2-7, 2-11, *available at* https://dcms-external.s3.amazonaws.com/MPD/62491/A27CFE013F8DCD6E8525745600510D9D/05_Chapter%202.pdf. Pursuant to Fed.R.Evid. 201(b), Plaintiffs request the Court take judicial notice of the relevant portions of the EIS at issue in *Medina*, which discuss the Surface Transportation Board's (STB) independent assessment of the trucking alternative's feasibility. Judicial notice is appropriate because the STB's statements in its EIS are not subject to reasonable dispute and can be accurately and readily determined from that document. *See, e.g.*, *Consol. Salmonid Cases*, 688 F. Supp. 2d 1013, 1017 (E.D. Cal. 2010) (taking judicial notice of an EIS). Moreover, judicial notice is proper because Enefit claims that *Medina* supports the agencies' actions here, and the EIS in *Medina* provides important factual context that rebuts Enefit's claim. *See Copar Pumice Co., Inc. v. Tidwell*, 603 F.3d 780, 791 n.3 (10th Cir. 2010) (court may take judicial notice of background information that informs court's understanding of factual context of the case).

applicant's representations about the feasibility of its trucking alternative, whereas Enefit's assurances that the alternative utilities are feasible are contradicted by its earlier statements to the contrary.[111]

In addition to Defendants' but-for causation argument, Enefit alone also argues that the South Project is not "reasonably certain to occur"—and thus is not an "effect of the action"—because final engineering plans have not been completed and it has yet to secure necessary permits.[112] Enefit again cites *Medina*, in which the court found the latter phases of the quarry development were not "reasonably certain to occur."[113] But there are two critical differences in the facts here. First, BLM's Biological Assessment,[114] and the Service's amended BiOp,[115] specifically treat the South Project's impacts as "cumulative effects," which are "those effects … that are *reasonably certain to occur*."[116] Second, the foundation of the BiOp's and the FEIS's analyses, and of the ROD's justification for approving the Utility Corridor, was that "Enefit has consistently stated and written to the BLM, investors, and to the general public that the South Project *will proceed* to full buildout, even if the BLM denies the requested Utility Project."[117] Enefit cannot have it both ways.

---

[111] Medina Railway Final EIS, 2-11 ("nothing in the record to indicate that…[applicant] would not transport the aggregate by truck if the rail line were not built.").

[112] Enef.Br. pp.40-41.

[113] *Id.*

[114] FWS_LIT_001909.

[115] FWS_001497-98.

[116] 50 C.F.R. § 402.02. Indeed, the only reason the Service "amended" its BiOp was to consider the South Project a "cumulative effect." Enef.Br. p.41.

[117] BLM_00028912. Moreover, Enefit neglects to mention the Consultation Handbook's guidance that a key indicator of actions "reasonably certain to occur" is a "project sponsor['s] assurance the action will proceed." FWS_000542.

**B.    Even assuming Enefit would fully build the South Project without the Utility Corridor, the Green River withdrawal is still an "effect of the action."**

Absent BLM's approval of the Utility Corridor, Enefit would not withdraw water from the Green River under any circumstance, for all of the alternatives Enefit has put forward for supplying the South Project would withdraw water from dozens of miles away in entirely different watersheds.[118] Indeed, Enefit has repeatedly admitted that the "effects on the Green River" from withdrawing water, and the resulting impacts on the endangered fish, "would be *a result of authorizing the Utility Project*."[119] Effects of the action—specifically, "indirect effects"—are those that are "*caused by or result from* the proposed action."[120] The Green River withdrawal thus is an indirect effect of the Utility Corridor. The Service's failure to analyze it as such was unlawful. Tellingly, the Service did not even address this issue in its brief.

Enefit alone argues, despite its previous admissions, that the Utility Corridor is not the cause of the Green River withdrawal "[b]ecause the Utility Corridor does not 'cause' the construction and operation of the South Project."[121] But even assuming the South Project would be built without, and is not caused by, the Utility Corridor, the Green River withdrawal and its resulting endangered species impacts nonetheless would not occur but for the Utility Corridor.

---

[118] Pls.Br. pp.47-49; BLM_00001768 ("should the BLM deny the water supply pipeline ROW, …the water…would…be sourced from a different location").

[119] BLM_00001837 (emphasis added); BLM_00000041 ("withdrawal of the same amount of water" from a different location, even "from the same water right[,]…has a very different technical impact than withdrawal from the Green River," including different "endangered fish impacts"); BLM_00001842 ("difference in withdrawal location is a primary source of the differences in [endangered fish] impacts.").

[120] FWS_000539; 50 C.F.R. § 402.02.

[121] Enef.Br. p.45.

The BiOp confirms Enefit's argument lacks merit, for it analyzed spills from the South Project's natural gas and oil product pipelines as "effects of the action" caused by the Utility Corridor, even though, according to the Service, the Utility Corridor is "not the 'but for' caus[e] of the South Project."[122] That categorization makes sense because Enefit supposedly would secure alternative sources of natural gas and oil transport without the Utility Corridor, and thus, of course, spills from the Utility Corridor's pipelines would not occur but for the Utility Corridor. For the same reason, the Green River withdrawal is an "effect of the action." The BiOp was arbitrary and capricious for failing to analyze it as such.

### C.    Alternatively, even if the South Project's impacts are "cumulative effects," the Service erred by failing to analyze those effects.

The Court need not reach this alternative argument if it finds that the central assumption at issue in this case was arbitrary and capricious. Yet even if, for the sake of argument, the South Project's impacts were properly considered "cumulative effects," the BiOp's failure to analyze those effects was unlawful.

Defendants argue that the Service properly declined to evaluate the Green River withdrawal as a cumulative effect because that withdrawal would be analyzed in a future consultation.[123] But that argument lacks merit, for the Service admits in its brief that it "*is possible*" there will be no future consultation.[124] And while Enefit may risk violating the ESA if it avoids consultation by not applying for an incidental take permit for the withdrawal, that does not excuse the Service's obligation to analyze the withdrawal in the BiOp.[125]

---

[122] Feds.Br. p.32.
[123] Feds.Br. pp.31-32, 36; Enef.Br. pp.46-47.
[124] Feds.Br. p.36.
[125] Pls.Br. p.50 n.269.

That obligation likewise is not excused by Defendants' claim that the information Plaintiffs identified that could underpin an analysis of the withdrawal—the sequencing map, mine-production schedule, and other materials—was in BLM's administrative record and thus was "not available to the Service."[126] Courts have confirmed that BLM's "fail[ure] to convey material information in its possession to [the Service]" renders the consultation "materially defective."[127] As for Defendants' additional argument that the record evidence identified by Plaintiffs would have been insufficient to analyze the South Project's impacts,[128] that argument amounts to post-hoc rationalization because the materials contain the exact information the Service claimed to lack.[129]

### D.     BLM violated ESA section 7(a)(2).

Enefit alone argues that BLM did not violate the no-jeopardy command in section 7(a)(2) of the ESA by relying on the Service's BiOp, even if that BiOp was flawed.[130] Yet it is well settled that an "agency cannot meet its section 7 obligations by relying on a [BiOp] that is legally flawed."[131] The Court should consequently reject Enefit's attempt to re-cast the fact-specific holdings of a few cases into a blanket rule that contradicts black-letter law.

---

[126] Feds.Br. p.37.
[127] *Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 302 F. Supp. 3d 1251, 1272 (D. Colo. 2018); *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir. 1993) (BiOp flawed owing to action agency's "failure to provide the FWS with [the best scientific and commercial data available]").
[128] Feds.Br. p.37; Enef.Br. p.47.
[129] Pls.Br. p.50.
[130] Enef.Br. p.48.
[131] *Ctr. for Biological Diversity*, 698 F.3d at 1127-28; *see also Colo. Envtl. Coal.*, 302 F. Supp. 3d at 1272 (arbitrary to "rel[y] on a BiOp resulting from a materially defective consultation").

**V.**     **BLM failed to take a hard look at the cumulative impacts of developing the RD&D and Preferential Leases.**

Plaintiffs argued in their opening brief that it was logically incoherent for the FEIS simultaneously to deem the RD&D and Preferential Leases to be "reasonably foreseeable" because "the leases will be issued and … will be developed," but also to conclude that "emissions would not occur" because "[n]o development is proposed."[132] Defendants do not grapple with this contradiction. Instead, they argue that BLM could not analyze the impacts of developing the leases because detailed information about the leases is unavailable.[133] However, that may excuse an agency's lack of analysis only if the agency lawfully avails itself of the regulatory procedure for analyzing impacts in the face of "unavailable information" under 40 C.F.R. § 1502.22. That, BLM did not do here. Instead, the FEIS conclusively stated that emissions "would not occur."[134] Without more, the FEIS failed to take a hard look at the cumulative impacts of developing the leases.

## CONCLUSION AND RELIEF SOUGHT

Plaintiffs respectfully request that the Court enter judgment in their favor on the first, second, fourth, sixth, eighth, and ninth causes of action in their Amended Complaint (ECF 64), and to vacate and set aside BLM's ROD, the Service's BiOp, and BLM's grant of the rights-of-way.

---

[132] Pls.Br. pp.52-53.
[133] Feds.Br. pp.38-39; Enef.Br. pp.48-49.
[134] BLM_00008060.

Dated: September 9, 2020                    Respectfully submitted,

Michael Toll
*Attorney for Grand Canyon Trust*

Heidi McIntosh
Michael Hiatt
Thomas Delehanty
*Attorneys for Living Rivers, Grand Canyon Trust,*
*Center for Biological Diversity, Natural Resources*
*Defense Council, Sierra Club, Waterkeeper*
*Alliance, Inc., Colorado Riverkeeper, and Utah*
*Physicians for a Healthy Environment*

Edward B. Zukoski
*Attorney for Center for Biological Diversity*

### REQUEST FOR ORAL ARGUMENT

The Plaintiffs request oral argument due to the nature of complex issues raised herein,

and believe that the decisional process would be significantly aided by oral argument.

### CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B)(ii), as enlarged pursuant to the Court's June 12, 2020 Order, ECF 80, because it

contains 7,480 words, excluding the parts of the brief exempted by Rule 32(f).

Michael Toll